# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SKANSKA USA BUILDING INC., a Delaware corporation, | No. 58950-8-II |
| Respondent, | |
| v. | |
| 1200 HOWELL STREET, LLC, a Washington limited liability company, | UNPUBLISHED OPINION |
| Appellant, | |
| FIDELITY & DEPOSIT COMPANY OF MARYLAND, an Illinois Insurance Company; SOUND GLASS SALES, INC., a Washington corporation, | |
| Third-Party Defendants, | |
| SOUND GLASS SALES, INC., a Washington corporation, | |
| Fourth-Party Plaintiff, | |
| KAWNEER COMPANY, INC., dba ARCONIC, INC., a Delaware corporation; METTEMEYER ENGINEERING, LLC, a Missouri limited liability company; ECKERSLEY O'CALLAGHAN & PARTNERS, LLC, a New York limited liability company, | |
| Fourth-Party Defendants. | |

GLASGOW, J.—In 2016, 1200 Howell Street LLC, hired Skanska USA Building Inc. to construct the 41-story Nexus condominium tower in downtown Seattle. Howell then withheld part

of Skanska's contract balance and refused to pay Skanska for additional work that arose from significant changes in design documents and other developments during construction.

In 2020, as it was finishing construction, Skanska recorded a lien on the Nexus tower property. Skanska then sued Howell for breach of contract, breach of the duty of good faith and fair dealing, and quantum meruit. Skanska also sought money to pay two subcontractor claims. Skanska sought to foreclose on the lien.

Howell counterclaimed for negligent misrepresentation, breach of contract, and breach of the duty of good faith and fair dealing. Howell sought liquidated damages under the contract for Skanska's delay in finishing the building and tort damages for negligent misrepresentation.

Pretrial, the trial court dismissed Howell's negligent misrepresentation claim on partial summary judgment. Howell did not move for summary judgment dismissal based on the plain language of the parties' contract regarding the format or time limits for requests for authorization of additional work, additional costs, or additional time for substantial completion.

Near the end of a seven-week trial, Howell instead moved for a judgment as a matter of law under CR 50, which the trial court denied without prejudice, allowing Howell to revive its motion post verdict. The jury awarded Skanska the overwhelming majority of its claims and awarded Howell limited liquidated damages on its breach of contract counterclaim. The net jury award to Skanska was roughly $19.2 million.

The trial court denied Howell's posttrial CR 50 motions for judgment as a matter of law or a new trial. In addition to the base jury award, the trial court awarded Skanska approximately $5.1 million in prejudgment interest and $6.6 million in attorney fees, including fees for expert

witnesses and subcontractors' attorney fees, for a total principal judgment of about $30.8 million. The trial court also foreclosed Skanska's lien on the Nexus tower.

Howell appeals. It argues that the trial court erred by dismissing its claim for negligent misrepresentation on partial summary judgment. Next, Howell contends that the trial court abused its discretion by excluding evidence alleging that Skanska generally mismanaged the project, and by declining to give a jury instruction about that evidence. And Howell asserts that the trial court erred by denying its CR 50 motions for judgment as a matter of law or a new trial. It further argues that the trial court erred by foreclosing Skanska's lien, awarding prejudgment interest, and awarding Skanska attorney fees. Both parties seek attorney fees on appeal.

We reverse the amount of prejudgment interest awarded to Skanska and remand solely for the trial court to recalculate the prejudgment interest for the limited number of authorization request (AR) claims Skanska submitted to Howell *after* Skanska recorded the lien. Prejudgment interest for those claims should begin to accrue on the day that Skanska submitted the AR claims to Howell, rather than the earlier lien date. We otherwise affirm. We deny Howell's request for attorney fees on appeal and grant Skanska's request for attorney fees on appeal.

FACTS

A.      Background

1.      Key contract provisions

Burrard Development LLC owned and managed Howell.[1] In 2016, Howell hired Skanska to build the Nexus tower. The parties initially negotiated a guaranteed maximum price contract for

---

[1] The parties referred to Howell and Burrard interchangeably. We will refer to the defendants collectively as "Howell" throughout to avoid confusion.

approximately $152 million. The contract allowed Skanska to charge Howell for the actual costs of building the Nexus tower, plus Skanska's fee, a contingency fee, and a lump sum for certain general overhead costs to run the project (known as general conditions and general requirements), up to the guaranteed maximum price. The contract required Skanska to achieve substantial completion by a particular date.

The guaranteed maximum price contract was based on architecture drawings that were only 60 percent complete. The contract allowed for a price amendment once the architect finished more detailed final drawings. The contract referred to the anticipated final drawings as "'100% Construction Documents,'" but when the drawings were produced, the parties referred to them as "Issued For Construction" documents. Ex. 46, at 4; Clerk's Papers (CP) at 653. The contract provided that when Howell authorized a change in the work that increased the actual cost of construction, the guaranteed maximum price would increase by the same amount.

Several contract provisions set procedures and processes. Provision GC-24(A) of the contract defined when the building would be substantially complete, requiring a temporary certificate of occupancy from the city and completion of other benchmarks. If Skanska did not substantially complete the building by a contractual date, it agreed to pay Howell $39,750 per day in liquidated damages, up to 2.5 percent of the project's price (about $4 million). And GC-25(C) let Skanska seek extensions of the substantial completion date for excused delays, such as extreme weather, as long as it notified Howell of the delay in writing within seven days.

Section GC-26 of the contract covered several key procedures regarding changes in the work. GC-26(A) allowed Skanska to change its scope of work if Howell approved the change in writing in a change order or change directive. GC-26(B) then stated that Skanska could not rely

on any course of conduct or dealing between the parties or claim of unjust enrichment to seek an increase in the contract price or time for work. Skanska could rely on only Howell's express approval of price increases or time extensions. GC-26(C) listed methods the parties could use to value changed work. If the parties could not agree on the price of the additional or changed work, this provision let Skanska seek the actual cost of its work, with corresponding increases to Skanska's fee and the general conditions and general requirements sum. And GC-26(D) required Skanska to submit written notice to Howell within seven days if any of Howell's instructions required extra cost or time to execute.

    2.    <u>Construction change directive 5, change order 9, and construction</u>

Once Skanska received the issued for construction drawings in the summer of 2017, it requested a $4.6 million increase to the guaranteed maximum price, while Howell had anticipated only a $2 million increase. Rather than amend the price to encompass all the changes between the 60 percent and the issued for construction documents, the parties agreed to have Skanska proceed with the work while requesting money for changes piecemeal through ARs. This process was formalized in construction change directive 5, which directed Skanska to build based on the issued for construction documents and change order 9, which set out the process through which Howell would approve resulting changes to cost and schedule impacts.

Specifically, change order 9 prescribed that Skanska would submit an architect-approved request for information (RFI) to Howell, and Howell would stamp the request. In relevant part, the stamp read: "Owner hereby directs Skanska USA Inc. to make the changes outlined and confirmed in this RFI with Skanska pricing and substantiation to follow." CP at 2162. The change order also authorized certain Howell employees to issue oral field directives for changes to the work that

5

would not change the total project price by more than $15,000 and would not add additional days to the construction schedule. Those oral field directives would then be confirmed by either party by e-mail within 24 hours.

In practice, Howell would approve and pay ARs that showed it had authorized work through stamped RFIs, construction change directives, field directives, supplemental instructions from the architect, or even meeting minutes. Howell would also approve ARs that arrived months late. Near the end of the project, Skanska on average submitted ARs to Howell 370 days after Skanska performed the underlying work. Through ARs and other increases, the guaranteed maximum contract price eventually increased to about $166 million.

Throughout construction, the project suffered numerous delays from water leaks, snow, unavailability of inspectors, and design conflicts. Delays that pushed back the project's substantial completion date were known as critical path delays. The initial contractual substantial completion date was in July 2019, but after several unforeseen incidents, including a major water leak, the parties jointly extended the substantial completion date to November 2019, although Skanska wanted a larger extension than Howell ultimately agreed to.

In early 2019, in the midst of construction, Skanska sued Howell over Howell withholding money due to defective work. The parties agreed to send this dispute to mediation.

Howell rejected many ARs, so by early 2020 there were approximately 180 disputed ARs. And due to design challenges, Skanska never completed decorative glass fins attached to the building's exterior. Howell eventually terminated for default Skanska's contract for "the design, procurement, and installation of the glass fins." CP at 3875. The lack of glass fins impeded Howell's ability to secure a final certificate of occupancy from the city.

The city issued a temporary certificate of occupancy on January 14, 2020. Howell began closing sales of condominium units in February 2020, but Howell never issued Skanska a certificate of substantial completion, claiming Skanska never completed the project. Howell also withheld approximately $9 million of the roughly $166 million contract price that it believed Skanska owed in liquidated damages for delayed substantial completion.

B.    Litigation

In 2020, Skanska recorded a lien on the Nexus tower and sued Howell for breach of contract, breach of the duty of good faith and fair dealing, and quantum meruit. Skanska amended its lien and complaint shortly thereafter to reflect the fact that the Nexus tower was a condominium, so Skanska's single lien against the property became hundreds of proportional liens. Skanska's first amended complaint sought roughly $9.5 million for its contract balance, $4.6 million for disputed ARs, and $6 million for pass through claims from its subcontractors. In several ARs, Skanska requested extensions of time on the contractual substantial completion date. Skanska also sought $11 million for "cumulative impact and delays on the Project" in the form of increased general conditions and general requirements costs. CP at 22. And it sought to foreclose on its lien. Howell later paid about $6.4 million of the withheld contract balance.

Howell counterclaimed for breach of contract and breach of the duty of good faith and fair dealing. It sought roughly $4 million in liquidated damages based on the delay in completing the Nexus tower. And Howell sought direct damages for Skanska's failure to manage its subcontractors or perform quality control or other contractual obligations. Howell also counterclaimed for negligent misrepresentation, arguing that it had suffered tort damages from

unfulfilled representations Skanska made about its ability to serve as a construction manager before the parties executed the contract.

      1.    <u>Summary judgment motions and second amended complaint</u>

Each party moved for partial summary judgment several times. First, Howell sought partial summary judgment to dismiss Skanska's cumulative impact claim, arguing that the contract barred generalized damages. The trial court partially granted the motion, stating that the contract did not allow claims for damages separate from those based on the parties' contractual agreements. Accordingly, the trial court dismissed any of Skanska's claims that could not be "tied to the language of specific agreements between the parties, namely the contract, change orders[,] and [change directive]s." CP at 3269.

Skanska then submitted a revised claim to Howell, adding general conditions and general requirements costs to the amount sought for each individual AR. Brian Cunningham, Skanska's project manager, catalogued the changes in a spreadsheet with roughly 20,000 line items.

In February 2021, Howell again moved for partial summary judgment, asking the trial court to rule as a matter of law that Skanska failed to achieve substantial completion because it never installed the glass fins. Accordingly, Howell asked the trial court to award it the maximum liquidated damages under the contract. The trial court denied partial summary judgment on this basis, reasoning that the contract provision defining substantial completion was not clear and that there were numerous disputed issues of material fact, leaving what constituted substantial completion as a question of fact for the jury.

Around the same time, Skanska moved for partial summary judgment to dismiss Howell's negligent misrepresentation claim. The trial court granted the motion based on Howell's failure to show an independent duty separate from Skanska's obligations under the contract.

In June 2021, the trial court allowed a second amended complaint reflecting Howell's partial payment of the withheld contract balance, the dismissal of Skanska's cumulative impact claim, and corrections in the amounts owed to subcontractors. At that time, Skanska sought roughly $3.8 million of the unpaid contract balance, $14.9 million in disputed ARs, and $3.1 million in subcontractor claims

Howell then moved for partial summary judgment once more, asserting that the contract did not permit Skanska's revised AR amounts for the same reason it barred the cumulative impact claim. Howell also asserted that the contract barred Skanska "from pursuing any claim for money" based on change order 9 because that "was an agreed no-cost change order," and that the contract otherwise capped general conditions and general requirements costs. Verbatim Rep. of Proc. (VRP) (July 16, 2021) at 6334-35. Howell also argued that under the contract terms, Skanska could not seek more than the agreed upon lump sum for general conditions and requirements costs, unless Howell authorized an increase before Skanska performed the work.

The trial court determined that there was a genuine issue of material fact as to whether change order 9 modified the contract by allowing Skanska to perform work before notifying Howell of the costs of that work. And the trial court determined that there was a genuine issue of material fact as to whether the increased costs in the revised claim were linked to the contractual provisions, emphasizing, "[c]redibility is not for me, it's for the jury." *Id*. at 6380. Accordingly, the trial court denied the motion.

In January 2022, Skanska moved to dismiss Howell's counterclaims for some breach of contract damages as consequential damages barred by the contract. It also sought dismissal of some of Howell's counterclaims because the parties agreed to resolve them in arbitration. The trial court partially granted the motion, dismissed Howell's counterclaims for consequential damages, and referred Howell's general mismanagement claims to arbitration.

Skanska also asked the trial court to rule that the Nexus tower was completed in February 2020, barring liquidated damages from accruing after that date because residents began moving in then, but the court denied summary judgment on this issue.

Howell did not bring any summary judgment motion arguing that the trial court should dismiss all claims for ARs that were not supported by express preapproval through a stamped RFI, construction change directive, or change order, as a matter of law. Nor did it assert before trial that any ARs were barred due to lack of notice as a matter of law. Nor did Howell bring any other summary judgment motion arguing that any of Skanska's claims should be dismissed based on the plain contract language as a matter of law.

2.     Trial proceedings

During motions in limine, the trial court excluded purported evidence of Skanska's general mismanagement that was not related to any specific AR, but the trial court reiterated that evidence related to specific ARs would be allowed to defend against those AR claims. The trial court stated that Howell could use general evidence for its case in chief related to its liquidated damages claim "and for any specifics that they want to bring in about a specific delay at a specific time." VRP (Jan. 24, 2022) at 67-68.

The seven-week trial involved roughly 180 miniature trials on disputed ARs, 28 witnesses, and about 800 exhibits. After Skanska rested and a few days before closing arguments, Howell filed an overlength CR 50(a) motion for judgment as a matter of law, raising eight issues and seeking to dismiss or partially dismiss many of Skanska's claims as a matter of law. Due to the short time before closing arguments, the trial court denied the motion without prejudice, which let Howell renew its motion after the jury verdict.

In part, the jury instructions stated that in interpreting the contract, the jury should give effect to the parties' intent. Howell proposed, and the trial court gave, an instruction providing that the jury could determine the parties' intent by considering extrinsic evidence including "all the facts and circumstances . . . surrounding the making of the contract, the subsequent acts and conduct of the parties . . ., and the reasonableness of the respective interpretations offered by the parties." CP at 18339. Another instruction that Howell proposed and the trial court gave, also explained that after a contract is formed, the parties can modify the contract if they mutually assent. To establish a modification of the contract, Skanska had to show that the parties agreed through "words or conduct . . . on all essential terms of the contract modification, and that the parties intended the new terms to alter the contract." CP at 18328.

The trial court declined to give several jury instructions that Howell proposed shortly before closing arguments. One of the rejected instructions stated that Howell had been barred from presenting evidence about Skanska's general mismanagement. Another sought to define what the term "certificate of occupancy" meant in the contract provision addressing substantial completion.

11

Ultimately, Skanska asked the jury to award it $3.8 million of its unpaid contract balance, $14.4 million in disputed ARs, and $2.4 million in subcontractor claims. Howell asked the jury to award it about $4 million in liquidated damages.

3.    Jury award, judgment, and foreclosure

The jury found that Howell wrongfully withheld Skanska's contract balance and breached the contract by not approving Skanska's ARs. The jury awarded Skanska the remaining withheld contract balance of about $3.8 million, roughly an additional $2 million to cover subcontractor claims, and a total of about $13.7 million in ARs, awarding Skanska all but four[2] of the disputed ARs.[3] The jury also awarded Skanska 53 days of extension on the contractual substantial completion date, so Howell could not collect liquidated damages for those days.[4] And the jury found that Howell breached its duty of good faith and fair dealing and that Skanska was entitled to quantum meruit, but it did not award damages for these alternative claims in light of its awards under the contract.

Next, the jury found that the glass fins were not necessary for substantial completion and that Skanska substantially completed the Nexus tower on January 23, 2020. Comparing the extended contractual completion due date with the date Skanska substantially completed the

_____

[2] The jury denied ARs 344, 394.1, 493, and 494.

[3] The jury completed a detailed special verdict form where the jurors identified the amount owed to Skanska for each of the disputed ARs except the four that the jury rejected.

[4] The jury awarded Skanska 10 days of delay for waterproofing to handle unforeseen groundwater, 8 days for a snow delay, 14 days for a delayed fire inspection, and 21 days for a design conflict. The jury also awarded Skanska additional days of delay for an insured water leak that is not at issue in this appeal.

building, the jury awarded Howell $318,000 in liquidated damages. After the liquidated damages award to Howell, the net jury award to Skanska was roughly $19.2 million.

After the verdict, Howell renewed its motion for judgment as a matter of law under CR 50(b) and alternatively sought a new trial. It argued that the trial court should dismiss Skanska's claims for the ARs that Howell did not approve through a stamped RFI or other written authorization, the ARs seeking approval of delays, the subcontractors' claims, the ARs that included revised general conditions and general requirements costs, and the quantum meruit claim. Additionally, Howell asked the trial court to rule as a matter of law that the glass fins were required for substantial completion. The trial court denied the motion, ruling that substantial evidence supported the jury verdict and, to the extent the CR 50(b) arguments were purely legal, Howell had waived them by failing to raise them earlier.

In addition to the base judgment, the trial court awarded Skanska approximately $5.1 million in prejudgment interest and $6.6 million in attorney fees and costs, including fees for experts and subcontractors' lawyers, for a total principal judgment of about $30.8 million. The trial court also foreclosed Skanska's lien on the building. Howell moved to amend the judgment, arguing that Skanska could not properly foreclose on the Nexus tower; the trial court denied the motion. Howell appeals.

Facts related to specific issues and sub-issues are discussed in more detail in the analysis.

ANALYSIS

I. SUMMARY JUDGMENT

Howell argues that the trial court erred by granting partial summary judgment to dismiss Howell's counterclaim for negligent misrepresentation under the independent duty doctrine, which

requires a party to show a tort duty separate from the contract in order to seek tort damages. We conclude that the trial court properly dismissed the negligent misrepresentation counterclaim.

A.     Relevant Facts

Howell's counterclaim for negligent misrepresentation alleged that Skanska promised to serve as a construction manager to induce Howell to hire it, and that Skanska negligently misrepresented that it would perform as a construction manager in its original proposal. The contract plainly included "construction management services" within Skanska's scope of work. Ex. 46, at 2. Howell alleged that months after litigation started, Skanska unexpectedly stated it did not consider itself a construction manager on the project, and that this and similar statements caused damages due to Skanska's failure to properly perform construction manager duties over the course of the project.

At a hearing on Skanska's partial summary judgment motion to dismiss the negligent misrepresentation claim, the trial court noted that the "misrepresentation claims arise out of actions by Skanska which are reflected in the duties assumed under the contracts." VRP (Mar. 5, 2021) at 27. The trial court concluded that Howell's cause of action arose from the contract, not from an independent tort duty. Accordingly, the trial court granted partial summary judgment and dismissed Howell's negligent misrepresentation claim.

Howell argues on appeal that the independent duty doctrine did not bar this claim because Howell produced evidence that Skanska convinced Howell to enter into the contract with false promises to perform construction manager duties in addition to serving as a general contractor. We conclude the trial court did not err in dismissing this counterclaim on summary judgment.

B.     Analysis

We review a trial court's summary judgment ruling de novo. *Ruvalcaba v. Kwang Ho Baek*, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012). Summary judgment is appropriate if, when taking the facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, "'reasonable minds could reach but one conclusion.'" *Crisostomo Vargas v. Inland Wash., LLC*, 194 Wn.2d 720, 728, 452 P.3d 1205 (2019) (quoting *Afoa v. Port of Seattle,* 176 Wn.2d 460, 466, 478, 296 P.3d 800 (2013)).

A party claiming negligent misrepresentation must establish six elements, including that the defendant supplied false information to guide the plaintiff in a business transaction, which the plaintiff reasonably relied on, and that "the false information proximately caused the plaintiff damages." *Dewar v. Smith*, 185 Wn. App. 544, 562, 342 P.3d 328 (2015). The test for damages "is not simply whether an injury is an economic loss arising from a breach of contract, but rather whether the injury is traceable also to a breach of a tort law duty of care arising independently of the contract." *Eastwood v. Horse Harbor Found., Inc.*, 170 Wn.2d 380, 394, 241 P.3d 1256 (2010).

Under the independent duty doctrine, an injury "is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract." *Id.* at 389. "When no independent tort duty exists, tort does not provide a remedy." *Id*. "One circumstance where the duty to avoid negligent misrepresentation might arise independently of the contract is where one party, through misrepresentations, induces another to enter into a contractual relationship." *Donatelli v. D.R. Strong Consulting Eng'rs, Inc.*, 179 Wn.2d 84, 96, 312 P.3d 620 (2013). But the claimant must show that the representation was "'made for the purpose of deceiving and with no

intention of performing.'" *Flower v. T.R.A. Indus., Inc.*, 127 Wn. App. 13, 32, 111 P.3d 1192 (2005) (quoting *Sprague v. Sumitomo Forestry Co.,* 104 Wn.2d 751, 762, 709 P.2d 1200 (1985)).

In *Donatelli*, the Washington Supreme Court affirmed a ruling denying summary judgment on a negligent misrepresentation claim against an engineering firm that orally promised a project would take 18 months and cost less than $50,000, when in fact the project remained incomplete after five years and cost more than $120,000. 179 Wn.2d at 88, 97. The contract at issue in that case "did not reflect whether [the engineering firm] agreed to provide managerial services or to oversee the day-to-day operation of the project." *Id.* at 88. Nevertheless, according to the plaintiffs, the firm assumed a managerial role over the project. *Id.*

The Donatellis sued the engineering firm for $1.5 million, alleging negligent misrepresentation and other claims. *Id.* at 89. The *Donatelli* court explained that the engineers' representations about the project's price and time induced the Donatellis to hire the engineering firm, so the duty to avoid negligent misrepresentations arose independently of the contract. *Id.* at 97-98. Consistent with the fact that project management services were not part of the contract, there was no argument in that case that the engineers failed to do something they contracted to do—instead, they negligently misrepresented the price and time required for the project. *Id.*

Howell relies on *Flower*, where Division Three reversed a summary judgment dismissal of a negligent misrepresentation claim premised on an employer's oral promise to not fire a prospective employee without cause. 127 Wn. App. at 33. Division Three explained that "the present existing fact Mr. Flower alleges is this: contrary to the promises Mr. Hunt made when he made the job offer to Mr. Flower, Mr. Hunt did not intend for the employment relationship to be anything but at-will." *Id.* at 32. Specifically, "Hunt testified that he would never hire an employee

16

under a for-cause agreement. Yet, that is what Mr. Flower claims that Mr. Hunt told him he would be." *Id*. at 32-33. Thus, there was "a genuine issue of fact as to whether Mr. Hunt had any intention of keeping his promise when it was made." *Id.* at 33.

Howell construes *Flower* to mean that "[f]alse statements concerning a party's present intent as to future conduct are remediable in tort under a negligent misrepresentation theory." Br. of Appellant at 83-84. But *Flower* expressly stated that the ultimate failure to perform a promise was not the foundation for Flower's claim; it was that the employer misrepresented the nature of the job. 127 Wn. App. at 32. In that case, there was a genuine dispute of material fact about whether the employer made a promise prior to entry of the contract that he never intended to keep. *Id*. at 33. *Flower*, like *Donatelli*, involved conflicting evidence about the promise made prior to the contract and the promisor's intent when making it.

Those cases are distinguishable from the present case. Here, the contract plainly required Skanska to perform "construction management services," so there is no dispute that Skanska affirmatively agreed to perform construction management, unlike in *Donatelli* where the contract did not cover management services. Ex. 46, at 2. And this case lacks the conflicting evidence about what was initially promised that prevented summary judgment in *Flower*. 127 Wn. App. at 32-33. Arguments about the scope of what "construction management services" entailed under the contract between Skanska and Howell are not properly part of a separate tort claim for negligent misrepresentation under the independent duty doctrine. *See Donatelli*, 179 Wn.2d at 97.

And the damages that Howell claimed for the alleged misrepresentation were cost overruns and indirect expenses arising from the delayed completion of the project under contract. The Supreme Court has followed other jurisdictions in observing that "failure to receive the benefit of

the bargain is a core concern of contract, not tort, law." *Alejandre v. Bull*, 159 Wn.2d 674, 685 n.3, 153 P.3d 864 (2007) (quoting *Casa Clara Condo. Ass'n v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1247 (Fla. 1993)). Howell has made no showing that there was a genuine issue of material fact as to independent damages outside of those that would arise from the contract.

In sum, Skanska is correct that failure to perform on promises made in a contract cannot by themselves support a tort claim of negligent misrepresentation. *Flower*, 127 Wn. App. at 32. Howell has not identified anything more than a precontract representation that Skanska would do exactly what it ultimately contracted to do, and that Howell sustained damages from losing the benefit of its bargain, which is not enough for a tort claim independent of the Howell's breach of contract claim. *Donatelli*, 179 Wn.2d at 97.

Therefore, the independent duty doctrine bars Howell's counterclaim. We hold that the trial court did not err by granting partial summary judgment and dismissing Howell's counterclaim for negligent misrepresentation.[5]

## II. EVIDENCE OF GENERAL MISMANAGEMENT

Howell asserts that the trial court abused its discretion by excluding general evidence that Skanska mismanaged the project, causing its own delays and cost overruns. We disagree.

A.    Relevant Facts and Arguments

Under the contract, the parties mutually waived any claim for consequential damages, including damages Howell incurred "for rental expenses, for losses of use, income, profit, financing, business[,] and reputation." Ex. 46, at 24. And the parties agreed to send to arbitration

---

[5] Given our holding, we do not address additional elements of negligent misrepresentation or the suggestion the trial court improperly excluded evidence regarding precontract negotiations.

certain counterclaims Howell made related to defective work and mismanagement. The trial court granted partial summary judgment, dismissing claims for damages barred by the contract or covered in the separate arbitration.

During motions in limine, Skanska moved to exclude evidence of bifurcated or dismissed claims, including the defective work and mismanagement issues referred to arbitration. The trial court excluded the evidence, stating that claims for damages stemming from mismanagement had a forum in arbitration and risked triggering "mini trials within mini trials" if raised in the present case. VRP (Jan. 24, 2022) at 60. The trial court emphasized that Howell could still offer evidence tied to specific ARs to explain "why an AR wasn't granted." *Id.* at 62. Similarly, specific "example[s] where poor management led to trade damage that led to denial of an AR or delay or where [Howell] was charged for trade damage" would be admitted. *Id.* at 63. And Howell could present generalized evidence in its case in chief for its claim for liquidated damages.

Throughout trial, the trial court allowed testimony about specific instances where Skanska failed to properly manage the flow of work, installed defective work, or failed to show that it had actually earned the money it sought in ARs.

A few days before closing arguments, Howell proposed several jury instructions relating to contract terms and evidence in the case. The proposed instructions included one addressing the excluded mismanagement evidence, stating, "The Court has excluded from this trial evidence that Howell believes is central to its defenses against Skanska's claims, including evidence pertaining to allegations of mismanagement, defective work, poor performance, Skanska's quality assurance/quality control efforts, and trade damage." CP at 15404. The trial court declined to give this instruction.

Howell argues that the trial court abused its discretion by excluding general evidence that Skanska mismanaged the project. Howell insists that the evidence was relevant and probative to Howell's counterclaim for liquidated damages based on the delay in completing the Nexus tower. It also implies that the trial court abused its discretion by refusing to issue Howell's proposed instruction about the mismanagement evidence. We note that the trial court's ruling allowed Howell to offer general evidence of mismanagement to support its liquidated damages claim. And we disagree with Howell's other contentions.

B.      Analysis

Only relevant evidence is admissible. ER 402. But even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 264, 840 P.2d 860 (1992). "A trial court abuses its discretion when its ruling is manifestly unreasonable or based on untenable grounds." *Fite v. Mudd*, 19 Wn. App. 2d 917, 930, 498 P.3d 538 (2021).

This case involved a seven-week trial that contained more than 180 miniature trials on individual ARs. The trial court excluded Skanska's cumulative impact claim, dismissed Howell's counterclaim for indirect damages, and referred counterclaims about defective work and mismanagement to arbitration. The jury decided narrowly tailored issues: whether Skanska was entitled to any of its roughly 180 ARs, its subcontractor claims, and the balance of its contract; and whether Howell was entitled to liquidated damages from the delay in completing the Nexus tower. Howell asserts that general evidence about "delays and cost overruns cannot be separated from

Skanska's specific AR claims," making the evidence relevant to Howell's defenses to those ARs. Br. of Appellant at 88. But Howell was allowed to offer evidence of specific instances where Skanska failed to properly manage the flow of work, installed defective work, or failed to show that it had actually earned the money it was asking for in an AR. Admitting generalized evidence of mismanagement and defective work unrelated to specific ARs, would have been minimally probative and posed a high risk of confusing the jury about the issues in a large, complex trial. Further, Howell could present generalized evidence when putting on its case in chief to support its claim for liquidated damages. It was not untenable for the trial court to otherwise exclude generalized evidence about the ARs to avoid confusion.

Additionally, "[a] trial court deprives a party of a fair trial when it issues a jury instruction that emphasizes one party 'to the explicit detriment of the other party.'" *Fite*, 19 Wn. App. 2d at 931 (quoting *Brown v. Dahl*, 41 Wn. App. 565, 579, 705 P.2d 781 (1985)). Howell's proposed curative instruction directly emphasized Howell's version of the case and suggested there was mismanagement the jury did not hear about to Skanska's detriment, so the trial court did not abuse its discretion by refusing to issue Howell's requested instruction.

We hold that the trial court did not abuse its discretion by excluding evidence about general mismanagement or by refusing to instruct the jury about the excluded evidence.

### III. CR 50 MOTIONS

Howell contends that the trial court erred by denying its pre- and post-verdict CR 50 motions for judgment as a matter of law. We disagree.

21

A.    CR 50(a) Motion

The trial in this case was subject to tight time constraints, due to the court's backlog of cases after the COVID-19 pandemic and Howell's counsel's other cases. Howell filed an overlength CR 50(a) motion and supporting documents on a Friday, a week after Skanska rested, when closing arguments were scheduled to start the next Thursday. The trial court observed that there was "little time realistically to substantively consider this overlength motion before Thursday's closing arguments" and denied the motion without prejudice, "effectively converting it into a 50(b)" motion. 26 VRP at 5693-94.

Howell argues that the trial court abused its discretion by denying Howell's preverdict CR 50(a) motion. Howell reasons that it filed the motion "well in advance of submission of the case to the jury" and that the trial court denied the motion without "a legally tenable reason." Br. of Appellant at 28-29. Skanska responds that the trial court denied the motion because it was overlength, and there was too little time for Skanska to respond and for the court to then consider the merits before closing arguments began.

CR 50(a) allows a court to enter judgment as a matter of law after close of the evidence. "A motion for judgment as a matter of law may be made at any time before submission of the case to the jury." CR 50(a)(2). "If, for any reason," the trial court does not grant the motion made at the close of evidence, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." CR 50(b). In addition, a party may renew their request for judgment as a matter of law, or alternatively seek a new trial, after the verdict. CR 50(b).

"When reviewing decisions granting or denying a judgment as a matter of law, we apply the same standard as the trial court." *Schmidt v. Coogan*, 162 Wn.2d 488, 491, 173 P.3d 273 (2007). But "[t]rial judges have wide discretion to manage their courtrooms and conduct trials fairly, expeditiously, and impartially." *In re Marriage of Zigler & Sidwell*, 154 Wn. App. 803, 815, 226 P.3d 202 (2010). Given the length of the trial; the lengthy nature of the motion and the number of issues raised; the time it would take for Skanska to respond; the limited time before closing arguments; the impact on the jury of delaying deliberations to resolve the motion; the backlog of other cases that the trial court needed to clear after the COVID-19 pandemic; and the fact that CR 50(b) let the trial court hear the motion without prejudice, meaning the trial court could evaluate the issues with more time to consider them and would do so under the same standard it would have used preverdict, we hold that the trial court did not abuse its discretion by denying Howell's CR 50(a) motion without prejudice, effectively postponing consideration of the motion until after the verdict.

B.      CR 50(b) Motion

By operation of CR 50, and because Howell renewed its motion after the verdict, the trial court considered Howell's request for judgment as a matter of law, or alternatively, a new trial, after the verdict. The renewed motion raised seven bases for relief, six of which Howell maintains on appeal. The renewed motion also sought a new trial under CR 59 as an alternative to judgment as a matter of law. In relevant part, Howell argued that the trial court should 1) dismiss Skanska's claims for ARs that lacked written authorization; 2) dismiss four ARs for delays that extended the contract deadline; 3) dismiss all claims for increased general conditions and requirements costs based on the change order 9 process: arguing a) that the claims were untimely, b) that change order

9 did not change the contract price, and c) that the claims violated the contract's cap on general conditions and requirements costs; 4) dismiss the subcontractors' claims; 5) dismiss the quantum meruit claim; and 6) rule as a matter of law that the decorative glass fins were required for Skanska to achieve substantial completion.

The trial court denied the motion, stating that "as to the factual issues . . . competent and substantial evidence exists to support the verdict." CP at 19113. And "to the extent that" any of Howell's counterclaims were "a purely legal argument, Howell waived each argument . . . because they were not raised before the verdict was rendered, whether at summary judgment or in its motions *in limine*." *Id*. The trial court also denied Howell's motion for a new trial because "the verdict did not show the jury ignored the Contract" or was prejudiced against Howell, and "[i]n all other respects, the verdict is supported by substantial evidence and is not contrary to the law." *Id*. The trial court emphasized that some of Howell's counterclaims still had a forum in arbitration under the parties' agreement.

Howell argues that the trial court erred by denying the postverdict CR 50(b) motion. In particular, Howell asserts that the trial court erred by ruling that Howell waived its purely legal arguments. Skanska responds by noting that the trial court first concluded that substantial evidence supported the jury's verdict, while secondarily stating that Howell waived its arguments "because they were not raised before the verdict was rendered." *Id.* And Skanska asserts that Howell did not properly preserve its claims that certain ARs lacked authorization and that the glass fins were required for substantial completion before including those claims in its CR 50(b) motion. More detailed arguments are described below.

We generally review a trial court's ruling on the merits of a CR 50 motion de novo. *Schmidt*, 162 Wn.2d at 491. "Judgment as a matter of law is not appropriate if, after viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences, substantial evidence exists to sustain a verdict for the nonmoving party." *Id*. In other words, a court should grant a CR 50 motion only when "'there is no competent and substantial evidence upon which the verdict can rest.'" *Johnson v. Washington State Liquor & Cannabis Bd.*, 197 Wn.2d 605, 611, 486 P.3d 125 (2021) (internal quotation marks omitted) (quoting *Delgado Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001)). Where "there is evidence, or there are justifiable inferences from evidence, upon which reasonable minds might reach different conclusions, the questions are for the jury, and not for the court, to decide." *Am. Prods. Co. v. Villwock*, 7 Wn.2d 246, 256, 109 P.2d 570 (1941). When "the parties present a mixed question of law and fact but do not dispute the facts, the question is one of law for the court." *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 441, 191 P.3d 879 (2008).

In this case, the trial court stated two reasons for denying the CR 50(b) motion: that substantial evidence supported the jury's verdict and that Howell waived any purely legal issues. And we may affirm on any basis supported by the record. *O'Dea v. City of Tacoma*, 19 Wn. App. 2d 67, 79, 493 P.3d 1245 (2021).

We address the facts related to each argument in turn below.

1.      Authorization for ARs

First, Howell argues that the contract's plain language barred ARs that Howell did not approve through specific mechanisms, and that the trial court erred by refusing to dismiss those claims as a matter of law based on unambiguous contract language.

25

a. Relevant facts

The contract had strict procedures for authorizing changes in the work. First, it provided that changes "authorized pursuant to Paragraph GC-26 . . . which result in an increase or decrease in the Actual Cost, as evidenced by Change Order, shall increase or decrease the [guaranteed maximum price] by a like amount." Ex. 46, at 6. In relevant part, GC-26(A) stated that Howell had to approve in writing any changes that Skanska proposed that would affect the contract price:

> The Owner, without invalidating the Contract, may . . . order extra Work, or make changes by altering, adding to, or deducting from the Work required by the Contract Documents pursuant to a valid Change Order or Construction Change Directive . . . . The Contractor shall not be authorized to change the scope of the Work in a manner that will result in an increase in the Contract Sum or [guaranteed maximum price], as applicable, or the Contract Time for alleged extra work, overtime, or changes in the Work of any kind *unless such work is approved in writing by the Owner prior to the commencement of such work and prior to the Contractor incurring any additional time or expense*. The Architect shall not be deemed an agent of the Owner for these purposes. The Contractor hereby waives any argument that the Owner's conduct (including, but not limited to, orally approving changes or extras) amounts to a waiver of the prior written change requirements of the Contract Documents. Changes in the Work shall be performed under applicable provisions of the Contract Documents, *and the Contractor shall proceed promptly*, . . . and the Contract Sum or Contract Time may be adjusted accordingly . . . . In the event the Owner or the Contractor requests a change in the Work, the Contractor shall promptly submit to the Owner and the Architect a concise summary of the change in the Work contemplated thereby, including an itemized breakdown of quantities and prices with respect to work included in the change for use by the Owner in checking the value of such work.

*Id*. at 54 (emphasis added). Next, GC-26(B) stated that any change to the work had to be authorized through a change order or construction change directive, and expressly prohibited inferring authorization through Howell's conduct:

> [N]o extra Work shall be performed or change shall be made in the Work unless pursuant to a written Change Order or Construction Change Directive from the Architect . . . countersigned by the Owner, stating that the Owner has authorized the extra Work or change, and no claim for additional compensation or credit or extension of time shall be valid unless so ordered. Accordingly, no course of

26

conduct or dealings between the parties, no express or implied acceptance of changes to the Work, and no claim that the Owner has been unjustly enriched by any change to the Work, whether true or not, shall be the basis for any claim to an increase in the Contract Sum or for extension of time.

*Id*. Thus, both GC-26(A) and (B) required a written change order or construction change directive before Skanska could depart from the work plan based on the architecture drawings that were only 60 percent complete, which were the controlling construction documents when the contract was executed.

Construction change directive 5 expressly, and in writing, directed Skanska to build the Nexus tower based on the issued for construction documents produced in the summer of 2017, instead of those based on the architecture drawings that were only 60 percent complete that the contract price was based on. And change order 9, which was implemented to streamline the process of approving ARs for changes necessary to meet the new requirements of the issued for construction documents, expanded the ways that Howell could authorize work to also include stamped RFIs.

Under change order 9, Skanska could submit an RFI "reviewed and stamped by the [architect], and approved by [Howell]" where Skanska provided "a non-binding[] but reasonable estimation of cost and schedule impact." CP at 2162. Howell would then return the RFI with a stamp: "The Owner hereby directs Skanska USA Inc. to make the changes outlined and confirmed in this RFI with Skanska pricing and substantiation to follow per the requirements of the contract, section GC-26. Preparation and execution of an appropriate Change Order will follow authorization request submission and approval." *Id.* Change order 9 also expressly authorized several Howell employees to issue verbal field directives—orders for changes to the work that

would add less than $15,000 to the contract price—that would be "confirmed by email within 24 hours by either party." *Id.*

Skanska submitted at least 80 ARs for amounts under $15,000, meaning that they could be authorized through field directives authorized under change order 9. Skanska also submitted some ARs without attaching stamped RFIs. For example, ARs 462 and 462.1 were claims from the subcontractor Sequoyah Electric LLC for a lighting consultant and additional document control. Skanska's project executive testified that those ARs were not authorized through a construction change directive or stamped RFI, but by "discussions that were had in meetings where Sequoyah kept reporting out that they were expending more and more costs," while Howell asked "that Sequoyah stay involved in these activities, especially lighting, because they needed to get it right." 12 VRP at 2274-75. This is a representative example of evidence presented to the jury that in practice, Howell insisted Skanska or its subcontractors should complete work described in their ARs despite lack of authorization through the limited means Howell now argues were required.

Some disputed ARs showed authorization in writing through e-mails, or RFI responses that were not the exact language of the change order 9 stamp. Other ARs did not include RFIs at all because they arose from site conditions, not the issued for construction documents. Further, some ARs attached RFIs where Skanska warned of a price impact that the architect seemed to accept.

Brent Brewder, who Howell hired to help manage the project's cost and schedule, testified that he reviewed ARs to determine whether Howell should approve them, and he frequently responded to Skanska with requests for more or different information. Brewder characterized ARs as "streamlined" construction change directives. 23 VRP at 4958. He stated that he reviewed ARs for "some form of owner approval" for the work done, entitlement to a change in the guaranteed

maximum price under the contract, and substantiation that the money sought in the AR was accurate. *Id*. at 4956. Brewder explained that approval for an AR could be a stamped RFI, construction change directive, field directive, supplemental instruction from the architect, *or even meeting minutes*. 26 VRP at 5507 ("[I]t depends on what the discussion was, but [meeting minutes] could've been acceptable."). In contrast, Brewder stated that Howell would deny ARs that did not show any means through which Howell had approved the changed work. And Howell denied AR 462 for Sequoyah's lighting specialist, the representative sample explained above, on this basis.

In closing arguments, Howell argued that more than 50 ARs lacked owner authorization in the form of a construction change directive or stamped RFI. A relevant jury instruction, which Howell requested, provided that the jury should determine the parties' intent. The jury could do so from "viewing the contract as a whole" and considering its "subject matter and apparent purpose," as well as extrinsic evidence including "all the facts and circumstances . . . surrounding the making of the contract, the subsequent acts and conduct of the parties . . ., and the reasonableness of the respective interpretations offered by the parties." CP at 18339. The jury denied recovery for two of the ARs Howell challenged on this basis.

b.      Arguments

Howell argues that the trial court should have dismissed Skanska's claims for all ARs that lacked proper written authorization as a matter of law based on the plain language of the contract. Howell relies on *Mike M. Johnson, Inc. v. Spokane County*, 150 Wn.2d 375, 78 P.3d 161 (2003), to argue that the trial court should have interpreted the contract's "unambiguous notice and claims procedures" to bar Skanska's AR claims as a matter of law. Br. of Appellant at 34. Howell insists that under *Mike M. Johnson*, ARs unsupported by a construction change directive or change order

pursuant to GC-26(B), or an RFI stamped according to change order 9, were invalid. Howell also argues that it could not have waived the authorization requirements through its conduct because the contract stated that any waiver had to be in writing. Finally, Howell contends that the authorization sources Skanska cites were not change orders, construction change directives, or stamped RFIs, so "they do not meet the unambiguous requirements of Section GC-26(B) and therefore are not valid." Reply Br. of Appellant at 6. We disagree.

c.      Contract interpretation principles

"The touchstone of contract interpretation is the parties' intent." *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). "In construing a contract, we give the parties' intent as expressed in the instrument's plain language controlling weight, and we give words in a contract their ordinary meaning." *W. Plaza, LLC v. Tison*, 180 Wn. App. 17, 22, 322 P.3d 1 (2014). "And we view the contract as a whole, interpreting particular language in the context of other contract provisions." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 713, 334 P.3d 116 (2014). "To assist in determining the meaning of contract language, we also apply the 'context rule,'" which "allows examination of the context surrounding a contract's execution, including the consideration of extrinsic evidence to help understand the parties' intent." *Id*.

"[A] contract is not ambiguous simply because the parties suggest opposing meanings." *Wm. Dickson Co. v. Pierce County*, 128 Wn. App. 488, 494, 116 P.3d 409 (2005). If a contract's "language is clear and unambiguous, the court must enforce the contract as written; it may not modify the contract or create ambiguity where none exists." *Lehrer v. Dep't of Soc. & Health Servs.*, 101 Wn. App. 509, 515, 5 P.3d 722 (2000). However, if the contract is ambiguous, we may

consider extrinsic evidence of the parties' intent to resolve the ambiguity. *Id*. at 516. If a "provision's meaning is uncertain or is subject to two or more reasonable interpretations after analyzing the language and considering extrinsic evidence (if appropriate), the provision is ambiguous." *Viking Bank*, 183 Wn. App. at 713.

Washington uses the "context rule" to determine the contracting parties' intent. *Adler v. Fred Lind Manor*, 153 Wn.2d 331, 351, 103 P.3d 773 (2004). A contract's context "includes the subject matter and intent of the contract, examination of the circumstances surrounding its formation, *subsequent acts and conduct of the parties*, the reasonableness of the respective interpretations advanced by the parties, and statements made by the parties during preliminary negotiations, trade usage, and/or course of dealing." *Id*. (emphasis added); *see also Kiona Park Ests. v. Dehls*, 18 Wn. App. 2d 328, 335, 491 P.3d 247 (2021). This is consistent with Howell's proposed jury instruction, which the trial court adopted.

"Contract interpretation is normally a question of fact for the fact-finder" when the contract is ambiguous. *Spradlin Rock Prods., Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County*, 164 Wn. App. 641, 654, 266 P.3d 229 (2011). Contract interpretation is a question of law only when "the interpretation does not depend on the use of extrinsic evidence," or "only one reasonable inference can be drawn from the extrinsic evidence." *Tanner Elec. Co-op.,* 128 Wn.2d at 674.

In general, contractors must follow contractual notice procedures unless the other party waives those procedures or the parties agree to modify the contract. *Mike M. Johnson*, 150 Wn.2d at 386-87. For example, "[a] building contract provision requiring a written order for alterations or extras will be enforced." *Swenson v. Lowe*, 5 Wn. App. 186, 188, 486 P.2d 1120 (1971).

"However, the requirement of a writing is for the benefit of the owner, and the owner, either expressly or by conduct, may waive such a requirement." *Id*.

A party can waive notice procedures through their conduct, but this "'requires unequivocal acts of conduct evidencing an intent to waive.'" *Mike M. Johnson*, 150 Wn.2d. at 386 (quoting *Absher Const. Co. v. Kent Sch. Dist. No. 415*, 77 Wn. App. 137, 143, 890 P.2d 1071 (1995)). In *Mike M. Johnson*, the Washington Supreme Court held that a county's actual notice of conditions requiring a change in work did not, by itself, waive the contractor's compliance with the contract's notice requirements. 150 Wn.2d at 391. The Supreme Court distinguished *Bignold v. King County*, 65 Wn.2d 817, 399 P.2d 611 (1965), where "it was the owner's knowledge of the changed conditions coupled with its subsequent direction to proceed with the extra work that evidenced its intent to waive enforcement of the written notice requirements under the contract." *Mike M. Johnson*, 150 Wn.2d. at 388.

### d.      Analysis

As an initial matter, Howell is correct that it was entitled to raise purely legal arguments for judgment as a matter of law in its renewed CR 50(b) motion. The plain language of the rule contemplates that legal questions can be decided postverdict and that judgment as a matter of law is still available postverdict, in addition to the remedy of a new trial. CR 50(b). Thus, we reject the trial court's reasoning with regard to waiver to the extent it implies that a party must preserve a legal argument for judgment as a matter of law before a postverdict motion under CR 50. Skanska and the trial court relied on *Browne v. Cassidy*, 46 Wn. App. 267, 728 P.2d 1388 (1986) and *Gorman v. Pierce County*, 176 Wn. App. 63, 307 P.3d 795 (2013), but in those cases, the parties failed to *ever* raise the rejected arguments before their postverdict motions for judgment as a matter

of law. *Browne*, 46 Wn. App. at 269; *Gorman*, 176 Wn. App. at 86. Howell raised all of its postverdict arguments either in front of the jury or in its preverdict motion, so *Browne* and *Gorman* do not apply to bar Howell's arguments.

Even so, the trial court also concluded that the verdict was supported by the evidence. Because there were such extensive changes with the adoption of the issued for construction documents, the parties further negotiated a process for Skanska to efficiently obtain approval of work that would increase the contract price and time for completing the project. We must consider the whole contract in context, including subsequent changes through construction change directive 5, change order 9, and Howell's subsequent actions during the AR process. *Adler*, 153 Wn.2d at 351; *Viking Bank*, 183 Wn. App. at 713. All of these are relevant to determining the parties' intent. Accordingly, as Howell proposed and the trial court provided in the jury instructions, the jury was entitled to consider extrinsic evidence of the parties' subsequent actions as part of the contract's context. *Adler*, 153 Wn.2d at 351. And we must consider this evidence in the light most favorable to Skanska. *Schmidt*, 162 Wn.2d at 491.

We note that *Mike M. Johnson* is distinguishable. There is no evidence that the parties in that case modified the contract procedures with change orders or other instruments, or that they mutually engaged in a course of conduct that directly contradicted the express contract provisions governing protest procedures after executing the contract. To the contrary, the county advised Mike M. Johnson to comply with the contract requirements when it notified the county of delays. 150 Wn.2d at 381. In fact, the county expressly rejected at least one letter as an attempt to modify the contract, and in another instance explicitly stated that it was not waiving any claim or defense

against the contractor by responding to the contractor's claims. *Id*. at 381-83. These facts are distinguishable from the events in this case.

Here, construction change directive 5 ordered Skanska, in writing, to build the Nexus tower based on the issued for construction documents, not based on the architecture drawings that were only 60 percent complete and that the original contract was based on. Thus, the waiver provision in GC-26(B) did not bar Skanska from seeking price increases or time extensions for performing this work as expanded by the construction change directive.

Next, viewing the entire contractual agreement in context, there are arguable contradictions between the original contract and change order 9 that rendered the proper forms of authorization ambiguous enough that the jury had to determine the intent of the parties. Change order 9 allowed Howell to approve work changes through stamped RFIs and field directives, then approve the cost of that work after Skanska finished the work. This expanded the short list of authorization methods in section GC-26(A) while contradicting the provision requiring the parties to agree on a price before Skanska performed any work.

In another contradiction, while GC-26(A) expressly barred Skanska from claiming that Howell's conduct constituted "waiver of the prior written change requirements," change order 9 both permitted the retroactive pricing mentioned above and expressly allowed oral field directives confirmed in e-mail by either party. *Compare* Ex. 46, at 54, *with* CP at 2162. For the same reason, change order 9 contradicted GC-26(B)'s prohibitions on Skanska doing extra work without a change order or construction change directive, or seeking increased cost or time based on any course of conduct between the parties. Almost half of the disputed ARs, including at least 35 that

Howell argues lacked written authorization, were for amounts under $15,000 that could have been authorized through oral field directives under the express written direction in change order 9.

In addition to the contradictions between the contract and change order 9, Brewder testified that the forms of authorization that Howell accepted in practice went beyond the listed methods of authorization in those documents. In fact, the forms of authorization that Howell accepted directly contradicted GC-26(A), because Howell would accept ARs supported by supplemental instructions from the architect, while GC-26(A) stated that the architect was not Howell's agent for the purposes of approving changes to the work. Further, the jury heard from Brewder that acceptable authorization methods would have included meeting minutes and oral authorization in meetings as well.

Given the contract's full context, including the modification from change order 9 and the subsequent course of dealing between the parties, there were issues of fact as to the parties' intent and it would have been inappropriate for the trial court to rule as a matter of law that the contract barred ARs unsupported by stamped RFIs, construction change directives, or change orders. *Adler*, 153 Wn.2d at 351. In other words, the parties' intent and ultimate agreement addressing authorization—including whether Howell waived the strict procedures in the contract—was properly a question of fact for the jury. *Spradlin Rock Prods.*, 164 Wn. App. at 654.

To that end, viewing the evidence in the light most favorable to Skanska, there was substantial evidence supporting the jury's verdict. *Schmidt*, 162 Wn.2d at 491. There was evidence that Howell waived the strict authorization procedures under GR-26(A). Many of the ARs that Howell contests in this argument sought less than $15,000, so under change order 9 they were properly approved orally through a field directive. And some were approved before change order

9 was executed. In other instances, disputed ARs demonstrated authorization in writing through e-mails. Other ARs provided RFI responses expressing authorization that were not the exact the change order 9 stamp, or accepting Skanska's warning of a price impact. And some disputed ARs arose from site conditions, not the issued for construction documents, so there was no RFI to stamp or include.

In sum, while some ARs lacked the type of written authorization required in the original contract, there was substantial evidence that the parties intended construction change directive 5 and change order 9 to expand the scope of acceptable methods of authorization, including some verbal authorizations for changes costing less than $15,000. Howell's consistent practice of approving ARs that were not supported by stamped RFIs, construction change directives, or change orders also provided substantial evidence of the parties' intent when viewed in the light most favorable to Skanska. *Schmidt*, 162 Wn.2d at 491. We hold that the trial court did not err by refusing to dismiss Skanska's claims for the ARs that Howell argued lacked authorization as a matter of law. Instead, we conclude that this was properly a question for the jury and that substantial evidence supported the jury's verdict.

2.      Timely notice of ARs

Next, Howell argues that Skanska's failure to strictly comply with the notice requirements in the contract barred four ARs that sought time extensions on the contract's substantial completion date. We disagree.

a.      Relevant facts

Skanska submitted four ARs seeking time extensions that Howell disputed: AR 292 for a snow delay, AR 357 for a fire inspection delay, AR 162 for additional waterproofing required after

unforeseen groundwater was discovered during excavation, and AR 433 for a clash in architectural and structural drawings that produced a design conflict.

Paragraph GC-25(C) let Skanska seek an extension of the deadline for substantial completion for certain delays—called excused delays—that did not change the scope of work. Skanska could request an "adjustment in its Contract Time(s) and the [guaranteed maximum price] for any delay to the Project attributable to circumstances outside of [Skanska's] reasonable control . . ., and which could not have been avoided or mitigated by reasonable efforts" from Skanska or its subcontractors. Ex. 46, at 52-53. The paragraph also stated that Skanska had to "deliver any such claim in writing to the Owner and the Architect . . . within seven calendar days of the Contractor becoming aware of the Excused Delay; otherwise, any such alleged Excused Delays shall be deemed waived." *Id*. at 53.

In contrast, GC-26(A) dealt with changes to the scope of work. That section stated that when "the Owner or the Contractor requests a change in the Work, the Contractor shall promptly submit to the Owner and the Architect a concise summary of the change in the Work contemplated thereby, including an itemized breakdown of quantities and prices with respect to work included in the change." *Id*. at 54.

During excavation of the Nexus tower in 2017, Skanska encountered unexpected groundwater that required upgrades to the waterproofing under the building's foundation. In an AR submitted in May 2018, Skanska estimated that this additional work delayed the critical path or overall project schedule by ten days.

On February 3, 2019, snow began falling in Seattle. At approximately 6:00 a.m. on February 4, Skanska e-mailed Howell that it had "limited crews onsite this morning due to the

snow," followed by an e-mail on February 14 that it believed additional snow on February 8 through 12 "me[t] the criteria for unusual weather that impacted the critical path." Exs. 1154-55. Skanska estimated eight days of delay from the snow.

On April 10, 2019, a subcontractor requested a routine fire department inspection—these inspections previously occurred weekly. When no inspector arrived, Skanska contacted the fire department on April 22. The fire department reported that one inspector had been injured and was out on leave for several weeks, and that no replacements were available. Skanska explored ways to secure an inspection or rearrange the project schedule to avoid a delay, then notified Howell in a meeting on April 30 that the lack of an inspector would likely cause a critical path delay, followed by a formal written notice of the impact on May 7. The inspection took place on May 5 or 6. In the May 7 notice, Skanska notified Howell that the length of delay had likely impacted the overall project schedule. After analyzing the impact on the critical path, Skanska estimated a delay impact of 14 days.

In May 2019, Skanska discovered a conflict between structural steel supports and a ceiling soffit,[6] requiring redesign of the ceiling in coordination with Howell and the architect. In an AR submitted in December 2019, Skanska estimated that the redesign delayed the critical path by 21 days.

At trial, the parties' scheduling experts provided conflicting testimony about whether each of the four events delayed the critical path. The jury awarded Skanska all four delay ARs, for a total of 53 days of extension on the substantial completion date and roughly $2.5 million for increased costs of the extra work and overhead for the additional days.

---

[6] Soffits are the undersides of construction features such as overhangs and alcoves.

b.      Analysis

Howell asserts that the trial court erred by not granting judgment as a matter of law for the four ARs seeking time extensions, insisting that Skanska failed to comply with contractual notice requirements. Howell reasons that Skanska had to submit *claims* in writing for time extensions, not just notice of the delay, within seven days of becoming aware of the delays. Because Skanska failed to provide written claims in the form of a formal AR within seven days, Howell asserts it should have prevailed as a matter of law. We disagree.

Skanska notes that it gave Howell initial written notice about impacts from snow the first day that it snowed and "within seven days of determining that the lack of [fire] inspection was causing a critical path delay" as required by the contract. Br. of Resp't at 41. Howell does not dispute that Skanska provided initial written notice of these events within seven days.

Instead, Howell argues Skanska failed to submit an AR for each delay within seven days. But requiring Skanska to submit the ARs within seven days of learning about the delays, rather than just written notice, would be premature. ARs required information like the total duration of the delay and its impact on cost, information that would not be known to Skanska until well after the delay began in these instances. The shortest AR requested 8 days of delay, and the longest 21 days. And it would be difficult to assess the impact of an ongoing delay on the project's critical path because building the Nexus tower involved many thousands of individual tasks, some of which could continue despite individual delays and some which could not. Indeed, there was competing expert testimony about whether the four events caused critical path delays at all, because workers could complete other tasks in the interim.

Nothing in the contract required Skanska to give Howell *a complete AR* within seven days—indeed, the term "authorization request" does not even appear in the contract. The contract requires only notice in writing of a "claim" within seven days for *excused* delays. Ex. 46, at 53. Change order 9 does not establish a process for claiming delays through ARs. Thus, whether Skanska complied with the contract's notice requirements by giving written notice of the basis for the delay within seven days was properly a question of fact for the jury, especially where we consider all facts in the light most favorable to Skanska. *Schmidt*, 162 Wn.2d at 491; *Spradlin Rock Prods.*, 164 Wn. App. at 654.

Additionally, Skanska is correct that the ARs for the groundwater issue and design conflict changed the scope of work, so they fell under GC-26(A), not (C). Section GC-26(A) does not have a time limit besides stating that Skanska should submit its summary of the change in work "promptly." Ex. 46, at 54. Howell does not point to any evidence establishing that Skanska failed to do so. And Howell would regularly accept and pay ARs submitted months after Skanska completed the underlying work.

In sum, viewing the evidence in the light most favorable to Skanska, there was substantial evidence that Skanska submitted notice of the delays in compliance with the contract. We hold that the trial court did not err by declining to dismiss Skanska's claims for delay ARs.

3.     Increased general conditions and general requirements costs and the cumulative impact claim

Howell argues that Skanska's claims for general conditions and general requirements costs were untimely or merely a repackaged cumulative impact claim that the trial court should have dismissed. It also argues that change order 9 was a no-cost change order that could not be the basis for claims for increased costs. And it argues that the plain language of the contract barred Skanska

from seeking general conditions and general requirements costs over a specified amount without prior approval from Howell. We disagree with all of these contentions.

a. Whether the increased general conditions and general requirements costs were timely

i. Relevant facts

General conditions costs were overhead management and supervision costs for Skanska's staff who were not on site building the project. General requirements costs were overhead costs to run the project overall, such as renting traffic control and portable toilets. Skanska's claims against Howell initially included a cumulative impact claim for about $11 million, seeking to recover general conditions costs and general requirement costs in addition to the actual costs of the specific activities to build the Nexus tower.

Howell moved for partial summary judgment to dismiss the cumulative impact claim as improper generalized costs not permitted under the contract and not timely submitted in compliance with the contract notice requirements. The trial court partially granted the motion, stating that the cumulative impact claim sought damages "untethered to the language of the parties' contractual agreements." CP at 3269. "Specifically, any claim by Skanska for General Conditions and General Requirements costs must be tied to a specific contractual agreement." *Id*. Therefore, the trial court dismissed "Skanska's claims for damages [that] cannot be tied to the language of specific agreements between the parties," such as the contract or change orders. *Id*.

Skanska then submitted a revised claim to Howell, adding general conditions and general requirements costs to the amount sought for each AR. Cunningham, Skanska's project manager, catalogued the changes in a spreadsheet of 20,000 line items. At trial, Howell cross-examined Cunningham—who testified for roughly 30 hours—about how he made the spreadsheet, including

the fact that he did not keep notes to back up the line items. When asked if the extra costs were general overhead divided amongst the ARs, Cunningham insisted "those are actual costs of the project that were reconciled appropriately to each individual AR." VRP (Feb. 10, 2022) at 76.

Howell also asked Mark Engleking, a Skanska project executive who helped Cunningham build the spreadsheet, about whether they created the spreadsheet because the contract did not allow cumulative impact claims. Engleking testified that Skanska abandoned the cumulative impact claim because it "could allocate those costs to the open ARs." 12 VRP at 2264. Engleking stated that he and Cunningham relied on accounting records, meeting minutes, letters, and e-mails to build the spreadsheet. He admitted that he did not keep any notes to explain how they determined individual line items.

Howell challenged the accuracy of the spreadsheet and questioned whether it was legitimate to add some overhead to the cost of each AR. And Skanska offered testimony about how the spreadsheet was created.

ii.       Analysis

Because Skanska revised its individual AR amounts to seek increased general conditions and general requirements costs after the trial court dismissed its cumulative impact claim, Howell contends that the contract bars all of those amendments to the ARs as untimely. And it insists that the amendments were invalid because the money was initially sought as an improper cumulative impact claim. We disagree.

First, nothing in the contract prohibits Skanska from amending ARs after submitting them. And the contract's context, including the parties' subsequent actions, supports this view. *Adler*, 153 Wn.2d at 351. As discussed above, change order 9 altered the contract's procedures for

42

approving changes to the work—specifically, it allowed Skanska to perform work and then seek payment for the cost of that work at a later date, with no fixed time limit. Moreover, Brewder testified that Howell regularly accepted and approved ARs submitted months after the relevant cost was incurred. Viewing the evidence in the light most favorable to Skanska, there was a factual conflict that prevented the trial court from ruling as a matter of law that the AR amendments were untimely. *Schmidt*, 162 Wn.2d at 491.

Next, the jury heard testimony that the added costs in each AR were linked to activities for that specific AR, not just general costs being split among 180 ARs. Howell's impeachment of the spreadsheet's creators about their questionable hours distributions and ability to back up their work were certainly valid considerations for the jury as factfinder. But at the very least, the jury heard conflicting testimony about whether the added overhead costs were a repackaged cumulative impact claim or were legitimately tied to specific ARs. Again, this conflicting evidence resulted in a factual issue that could not be decided as a matter of law. *Am. Prods. Co.*, 7 Wn.2d at 256.

The nature of the increased costs in the revised ARs and whether the amendments were timely were factual issues, not legal ones, so there was no pure question of law for the trial court to resolve with judgment as a matter of law. *Id.* Accordingly, we need not reach Howell's argument that these were legal issues the trial court improperly deemed waived. And there was substantial evidence—the spreadsheet and the extensive supporting testimony—to support the jury verdict awarding Skanska the increased costs, especially when we view the evidence in the light most favorable to Skanska. *Schmidt*, 162 Wn.2d at 491. We hold that the trial court did not err by declining to dismiss Skanska's claims for revised ARs that Howell believed were untimely and included the repackaged cumulative impact claim.

b.       Change order 9 as a basis for increased overhead costs

Next, Howell asserts that the trial court should have dismissed Skanska's revised claims containing the general conditions and general requirements costs because the contract required *prior* approval of increases to those costs, and change order 9 did not modify the contract price. We disagree.

i.       Relevant facts

Section GC-26(B) required Skanska to accept the amount of money in any change order as "full compensation" for "all work required in connection with the Change Order" as well as for "all acceleration, delay, loss of efficiency, inconvenience, increased supervision or other claims, costs, expenses[,] or damages which have been, or may be, incurred" as a result of "the issuance or occurrence of the Change Order. . . and/or the performance of the Work required or other costs incurred in connection with the Change Order." Ex. 46, at 55.

Change order 9 contained zero information about its effect on the price of building the Nexus tower:

| | |
|---|---|
| (a) Original Contract [guaranteed maximum price] was: | N/A |
| (b) Net Change by Previous Change Orders: | N/A |
| (c) [Guaranteed maximum price] prior to this Change Order was: | N/A |
| (d) Effect of this Change Order on [guaranteed maximum price] | N/A |
| (e) Total Change Orders to Date | N/A |
| (f) New [guaranteed maximum price] including this Change Order | N/A |

CP at 2162. And instead of stating a specific price for all of the changed work between the 60 percent and issued for construction documents, change order 9 merely described the stamp that Howell would use to authorize changed work in future RFIs, which included the language directing Skanska "to make the changes outlined and confirmed in this RFI *with Skanska pricing and*

*substantiation to follow . . . . Preparation and execution of an appropriate Change Order will follow authorization request submission and approval.*" *Id*. (emphasis added).

Skanska employees testified at trial that the AR process was unusually exhaustive and thorough, consuming far more time and effort than the standard change order process, and it required the hiring of additional field supervision while Skanska's management team worked on substantiating ARs.

ii.      Analysis

Howell asserts that every AR containing revised general conditions and general requirements costs is barred by change order 9 because the change order "expressly did not modify" the guaranteed maximum price. Br. of Appellant at 45. Howell reasons that under GC-26(B), because change order 9 did not by itself change the guaranteed maximum price, the change order was full compensation for all of the changed work and processes it produced. Thus, Howell believes that Skanska could not seek any guaranteed maximum price increase based on having to follow change order 9's AR process. We disagree.

Change order 9 did not assert that it had no effect on the guaranteed maximum price—it did not contain any information about the contract price or the effect of the change order on that price at all. It expressly saved the specific amounts of increased compensation for another day. Moreover, it did not expressly limit compensation by precluding additional payment for general conditions or general requirements. Indeed, there was substantial evidence that neither party intended change order 9 to have a price impact of $0, given that Howell reportedly believed the changes to the issued for construction documents would cost $2 million to build while Skanska

believed that they would cost $4.5 million. And the jury received evidence that the process required Skanska to hire additional staff because of Howell's stringent substantiation requirements.

There was, at the very least, competing evidence about whether change order 9 was intended to have a cost impact on the guaranteed maximum price, so this issue could not be resolved in Howell's favor as a matter of law. *Am. Prods. Co.*, 7 Wn.2d at 256. We need not address whether Howell waived this argument. We hold that the trial court did not err by declining to dismiss Skanska's claims for increased general conditions and general requirements costs tied to the change order 9 process.

>           c.      Lack of preapproval for increased general conditions and general
>                   requirements costs

Howell also contends that the contract barred Skanska's revised claims for increased general conditions and requirements costs because Howell did not approve the increased costs before Skanska incurred them. We disagree.

>           i.      Relevant facts

Section GC-26(C) provided several ways for the parties to agree on the value of changed work, such as pricing by unit or a lump sum estimate. The provision also gave a remedy if the parties could not agree: "If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum the adjustment shall be based on the Actual Cost attributable to the change" plus a four percent fee for large changes. Ex. 46, at 56.

The contract stated that the "Actual Cost of the Project shall mean all costs necessarily incurred in the proper performance of the Work, paid or payable by the Contractor, and not required . . . to be borne by the Contractor or otherwise excluded from the Actual Cost or Contract Sum by the Contract Documents." *Id*. at 6. It then listed several items expressly included in or

excluded from the definition of actual cost. And the contract provided that "[c]hanges in the Work authorized pursuant to Paragraph GC-26 . . . which result in an increase or decrease in the Actual Cost . . . shall increase or decrease the [guaranteed maximum price] by a like amount." *Id*. at 6.

Outside the definition of actual cost, section 3.7 stated that the guaranteed maximum price included "General Conditions Costs" listed in an exhibit, "the cost of which shall be no more than the stipulated-sum amount set forth as a line item in the schedule of values." *Id*. at 11. "[I]n no event may the cost of the General Conditions Costs exceed the total cost illustrated in Exhibit G without the express written consent of the Owner by way of Change Order . . . in advance of the Contractor incurring any additional General Conditions Costs." *Id*. (underline omitted). "The General Conditions costs will be a lump sum amount within the [guaranteed maximum price]." *Id*. Exhibit G then provided a schedule of values for various items and people needed for construction, from project engineers to sanitary supplies.

At trial, Cunningham, Skanska's project manager, testified that the cap in Exhibit G contemplated "100% complete documents and an executed [guaranteed maximum price] and no changes." 11 VRP at 1985. In contrast, change order 9 let Skanska seek increased general conditions and general requirements costs for dealing with the AR substantiation process. Meanwhile, a Howell development manager testified that the revised costs Skanska sought in the ARs were essentially an improper repackaged cumulative impact claim.

ii.     Analysis

Howell argues that the increased general conditions and general requirements costs violated section 3.7 of the contract limiting how much Skanska could claim for those costs without Howell's approval. The contract required Howell to execute a change order before Skanska

47

incurred increased costs, while Howell reasons that it never approved the additional costs, much less in advance of Skanska incurring them, so they are barred by the contract. We disagree.

As with other issues, Howell's logic requires a strict interpretation of the contract that disregards the subsequent change order 9 and the AR process. Change order 9 turned the standard change order process on its head by letting Howell direct Skanska to perform work and submit pricing information later, with no fixed deadline for when Skanska had to submit that cost information. And Howell personnel testified that Howell would accept and approve ARs that Skanska submitted months after it completed the underlying work. Further, because there is evidence the parties failed to agree on a specific pricing mechanism, Skanska is correct that the actual cost of construction was the appropriate way to calculate the value of ARs. Given the conflicting evidence about the parties' intent, whether Skanska was entitled to the increased costs of this type was a question of fact for the jury. *Spradlin Rock Prods.*, 164 Wn. App. at 654.

Admittedly, it is not clear from the contract's structure whether the general conditions costs were included within the definition of actual cost. But as discussed above, the parties clearly contemplated that ARs would increase the guaranteed maximum price when they executed change order 9, regardless of whether general conditions costs are actual costs or a separate element of the guaranteed maximum price. Given that the parties estimated that the issued for construction documents would result in roughly $2 million to $5 million in extra work, it was inevitable that they would also increase the general conditions and general requirements to manage the work of building the project. Nothing in change order 9 expressly prohibits Skanska from seeking increased general conditions costs, and the jury heard conflicting testimony about whether change order 9 allowed Skanska to seek payment for increases in these costs as increases to the actual cost of

construction. Taken together and viewed in the light most favorable to Skanska, there was substantial evidence that Skanska could seek increased general conditions and general requirements costs for the changes in the issued for construction documents. *Schmidt*, 162 Wn.2d at 491.

Because there was substantial evidence to support the jury's verdict, we need not reach Howell's contention that it did not waive this argument. We hold that the trial court did not err by declining to dismiss Skanska's claims for increased general conditions and general requirements costs.

### 4. Subcontractor costs

Howell argues that Skanska could not pass through claims from its subcontractors because Skanska did not approve or pay the initial subcontractor claims. We disagree.

#### a. Relevant facts

The contract defined the project's actual cost to include "all costs necessarily incurred in the proper performance of the Work, paid *or payable* by the Contractor." Ex. 46, at 6 (emphasis added). In the list of items expressly included in the actual cost, section 3.2(f) added "[p]ayments made by the Contractor to Subcontractors for Work performed pursuant to subcontracts under this Contract." *Id*. at 7.

Holmberg Mechanical and Sequoyah Electric were subcontractors for Skanska. Skanska's claims included two pass-through claims from these subcontractors: Sequoyah sought roughly $249,000 and Holmberg about $2.1 million. Skanska originally submitted the claims to Howell despite expressing concerns to the subcontractors about the merits of their claims. There was evidence at trial that in at least one case, Howell specifically requested that Skanska forward the

claim information without first performing any detailed review. The jury awarded Sequoyah's entire claim and about $1.7 million of Holmberg's claim.

        b.      Analysis

Howell argues that the trial court erred by refusing to dismiss claims that Skanska passed through from its subcontractors. Howell asserts that the language of section 3.2(f) recited above meant that Skanska had to either pay the subcontractor claims or expressly approve them as payable before it could pass those claims through to Howell. Thus, Howell insists that it was error to not dismiss the claims because Skanska had not approved the amounts as payable.[7] It also asserts that evidence at trial indicated that Skanska, not Howell, was responsible for the delays that produced the subcontractors' excess costs. In response, Skanska emphasizes that the contract allowed Skanska to seek all costs "paid or payable" by Skanska—not only costs that it had already paid. Ex. 46, at 6. We agree with Skanska.

Here, both parties present conceivable interpretations of what the parties intended "payable" to mean with regard to subcontractor claims. And Skanska presented evidence that in practice, Howell specifically requested that at least some subcontractor claims be passed directly through to Howell. As a result, the trial court was confronted with conflicting evidence that prevented it from granting Howell judgment as a matter of law on the subcontractor pass-through claims. *Am. Prods. Co.*, 7 Wn.2d at 256.

---

[7] Howell also states in a single sentence that the claims were improper cumulative impact claims, and some of the claims were barred by change orders, but Howell does not develop these arguments. In its reply, Howell asserts only that Skanska had to approve the subcontractor costs as payable before it could seek them in ARs.

Taking the testimony that Howell directed Skanska to pass through the claims and the contract ambiguity in the light most favorable to Skanska, there was substantial evidence to support the verdict with regard to these claims. *Schmidt*, 162 Wn.2d at 491. Accordingly, we need not reach the argument that Howell waived this issue. We hold that the trial court did not err by refusing to dismiss the subcontractor claims.

5.      Quantum meruit

Howell next argues that the trial court should have dismissed Skanska's alternative quantum meruit claim as a matter of law. The jury awarded Skanska $0 for this claim because it instead awarded Skanska damages under the contract claims. Because we affirm the jury's award based on Skanska's other claims, we need not reach this claim, which was an alternative theory of liability.

6.      Glass fins

Finally, Howell argues that the trial court should have ruled as a matter of law that Skanska could not achieve substantial completion without installing the exterior glass fins. Howell also asserts that the trial court abused its discretion by refusing to issue a jury instruction about the definition of a certificate of occupancy. We disagree.

a.      Relevant facts

The design documents included decorative glass fins as part of a curtain wall system on the exterior of the building. Skanska submitted numerous design proposals for the glass fins, continuing more than a year after litigation commenced, all of which Howell rejected. In May 2021, Howell terminated the portion of the contract for the glass fins from Skanska's contract for default.

The contract had a complicated definition for substantial completion. Among other things, substantial completion required a temporary certificate of occupancy and the completion of all work that interfered with Howell's or any unit owner's intended use:

> "Substantial Completion" shall be deemed to have occurred when the following shall have occurred or shall have been delivered to the Owner, as applicable (i) *Temporary* Certificate of Occupancy is issued by City of Seattle; (ii) *the Work shall have been fully completed* in accordance with the Contract Documents and applicable Laws, *except for punch list work* that in the aggregate can be completed during normal working hours within 60 calendar days, *which does not interfere with the Owner's or any unit owner's intended use or beneficial occupancy of any portion of the Project* (i.e., as a mixed-use Project of residential condominium units and a first-class retail space) in any material respect *or interfere with the Owner's ability to obtain a Certificate of Occupancy listed on the Certificate of Substantial Completion* as agreed between the Owner, the Architect and the Contractor (in this regard, the Contractor specifically acknowledges and agrees that Substantial Completion shall require the completion in all material respects of all interior unit punch list items).

Ex. 46, at 50 (emphasis added) (boldface omitted). Exhibit M of the contract was a blank certificate of substantial completion.

The contract also defined "*final* completion," which required, among other things, "issuance of all required approvals and certificates by any authorities with jurisdiction over the Project without condition (including final and unconditional certificates of occupancy)." *Id*. at 51.

The contract allowed for liquidated damages if, due to the fault of Skanska or its subcontractors and not due to an excused delay, Skanska did not achieve substantial completion on the contracted or amended date. Liquidated damages would accrue at a rate of $39,750 per day, up to a cap of about $4 million, for failure to achieve substantial completion after the contracted date.

The city issued a temporary certificate of occupancy for the Nexus tower on January 14, 2020. And Skanska attempted to turn over the building keys to Howell on January 23, 2020, but

Howell refused turnover. In February 2020, Howell's vice president of development began filling out a certificate of substantial completion, but Howell never sent Skanska any certificate of substantial completion for the project. Howell began closing sales of condominium units in mid-February 2020, with owners moving in almost immediately thereafter.

There was conflicting testimony at trial about what the phrase "Certificate of Occupancy listed on the Certificate of Substantial Completion" referred to, whether it was different from either the temporary or final certificates of occupancy issued by the city, and whether the glass fins were required to achieve substantial completion under the contract. Witnesses testified that the city would issue a temporary certificate of occupancy once the building interior was safe to live in, while the design review board had to approve the building exterior before it would issue the final certificate of occupancy. To that end, in early 2020, the city stated that the lack of fins and several other items prevented finalization of a land use permit and therefore kept the city from issuing a final certificate of occupancy.

An architect who worked on the Nexus tower testified that a certificate of substantial completion addressed whether "the building is done based on the contract," while a certificate of occupancy addressed whether "people can live in it." 22 VRP at 4801. But the architect said the Nexus tower was not substantially complete on January 23, 2020, despite the temporary certificate of occupancy, because the glass fins had not been completed. And a Howell development manager testified that thousands of punch list items remained in January 2020, in addition to "material that was not installed, which [was] not punchlist" work. 26 VRP at 5653.

In contrast, Skanska's project executive testified that the glass fins did not impact Howell's or any condominium unit owner's ability to use or occupy the building. And Skanska pointed out

that unit sales began closing and individual owners began moving in on February 2020, despite the lack of glass fins.

Skanska also emphasized that on a substantial completion walk-through with members of the Howell leadership in early February 2020, Howell did not raise any concerns about the status of completion. And because the glass fins *could* have been completed within 60 days once Howell approved a design, Skanska's schedule expert testified that the fins were punch list work not required to achieve substantial completion.

Overall, Skanska argued that the contract required only a temporary certificate of occupancy for substantial completion, and that the failure to complete the glass fins did not interfere with Howell's ability to use the building by selling condominium units, or with unit owners' ability to live in their properties. On this basis, it asserted that it substantially completed the Nexus tower on January 23, 2020. Howell's theory was that the contract required a final certificate of occupancy, so Skanska's failure to complete the glass fins prevented it from achieving substantial completion.

A few days before closing arguments, Howell proposed jury instructions, including one stating that because the "contract defines the requirements for Substantial Completion for the Project, Substantial Completion was not achieved until all of those requirements are satisfied, regardless of whether the owner had beneficial use and/or occupancy of part or all of the project." CP at 15401. And another proposed instruction defined a certificate of occupancy:

> A Certificate of Occupancy is a document issued by the City of Seattle. A Certificate of Substantial Completion is not a Certificate of Occupancy. Section GC-26.A . . . provides that Substantial Completion requires that the Work has been fully completed in accordance with the Contract Documents and applicable Laws, except for punch list work that, among other things, does not interfere with Howell's ability to obtain a Certificate of Occupancy for the Nexus project.

CP at 15406. The trial court refused to give these instructions because it concluded they were untimely (the trial court also rejected late proposed instructions from Skanska) and inappropriate statements of the case.

The instructions the court gave the jury explained what the glass fins were and then stated, "Skanska did not install the Glass Fins. You may not consider reasons why Skanska did not install the Glass Fins or who is at fault.[8] It is for you to decide, based on the evidence, whether the Glass Fins were required for achievement of Substantial Completion under the parties' contract." CP at 18353.

The jury found that the glass fins were not necessary for substantial completion. And the jury found that Skanska substantially completed the Nexus tower on January 23, 2020. The jury awarded Howell only eight days of liquidated damages.

b.      Analysis

Howell argues that the trial court erred by refusing to rule as a matter of law that Skanska had to complete the glass fins to achieve substantial completion. And it contends that the trial court abused its discretion by refusing to issue a jury instruction about "the definition of a Certificate of Occupancy." Br. of Appellant at 54. Howell emphasizes that the lack of fins prevented it from obtaining a final certificate of occupancy from the city. Consequently, it insists that there was not substantial evidence to support the jury's verdict that substantial completion occurred in January 2020 because the fins were not done by that time.

---

[8] The claims against the subcontractor that struggled to design the fins were bifurcated and not part of this trial.

Skanska responds that Howell failed to preserve this argument before asserting it in the CR 50(b) motion. On the merits, Skanska asserts that the contract required only that the city issue a temporary certificate of occupancy, not a final certificate. It insists "the determinative issue is *not* whether and when the City of Seattle issued a Certificate of Occupancy, but rather whether and when the Project was sufficiently complete for Howell to occupy and utilize it as a residential condominium building." Br. of Resp't at 69. And Skanska argues that under this interpretation, there was substantial evidence to support the jury's verdict that the building was substantially complete by January 23, 2020. We agree with Skanska.

To begin, Howell argued to the jury that Skanska's failure to install the glass fins precluded substantial completion, so this issue was not waived. But there were multiple possible applications of the contract language, rendering it ambiguous, so the parties' intent and whether the contract requirements were met were questions of fact for the jury, and we must determine whether substantial evidence supported the verdict. *Schmidt*, 162 Wn.2d at 491; *Spradlin Rock Prods.*, 164 Wn. App. at 654.

In a case where a party argued that a condominium building was not substantially complete until the first units sold, Division One held that the building was substantially complete when the city issued a certificate of occupancy several months earlier, although punch list work remained at that time. *1519-1525 Lakeview Blvd. Condo. Ass'n v. Apt. Sales Corp.*, 101 Wn. App. 923, 931-32, 6 P.3d 74 (2000).

Here, the contract provision is ambiguous as is the parties' intent as to how it would be applied. The jury heard conflicting testimony about whether substantial completion required a temporary or final certificate of occupancy. And while the glass fins held up issuance of a final

certificate of occupancy, the city issued a temporary certificate in January 2020. The jury also heard evidence that the lack of glass fins did not impair Howell's ability to sell units or for unit owners to live in their properties starting in February 2020. The evidence that the temporary certificate had been issued, and the undisputed evidence that unit owners were moving in by February 2020, despite the lack of glass fins, amounted to substantial evidence supporting the jury finding that the fins were not required for substantial completion. *Schmidt*, 162 Wn.2d at 491.

We hold that the trial court did not err by declining to rule as a matter of law that the glass fins were required for substantial completion. Likewise, the trial court did not abuse its discretion by declining to issue Howell's proposed jury instructions defining substantial completion and certificate of occupancy through Howell's lens. *Fite*, 19 Wn. App. 2d at 931.

Overall, we hold that the trial court did not err by denying Howell's CR 50(b) motion.

IV. PREJUDGMENT INTEREST

Howell argues that the trial court erred both in awarding prejudgment interest and in calculating the date that prejudgment interest began accruing.

A.     Relevant Facts

Prejudgment interest is usually available only for liquidated damages, *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 124, 323 P.3d 1036 (2014), so the way damages were characterized was relevant. The trial court gave a jury instruction, which was based on the American Bar Association's model jury instructions, explaining how to award damages. The instruction directed, "You must be able, in view of the evidence offered, to arrive with a reasonable degree of certainty at some conclusion about a party's loss as a result of the other party's breach." CP at 18348. But it cautioned, "[d]ifficulty in determining the amount of damages is not to be

confused with the right of recovery" and explained, "If a party has proven entitlement to damages and shown to the jury's satisfaction a reasonable basis for estimating their damages, that party is not to be denied recovery because the amount of damages is incapable of exact ascertainment." *Id.* Finally, the instruction directed the jury "to use sound discretion in fixing an award of damages, if any, drawing reasonable inferences where you deem appropriate from the facts and circumstances proven to you through the admitted evidence." *Id.*

In closing arguments, Skanska compared the ARs to M&M's candies. It stated that the jury could start with a full bowl if it "generally agree[d] that Skanska has presented entitlement to its actual costs," but "still discuss any of the specific ARs or cost items you're unsure about" and remove them from the bowl if it did not believe Skanska was entitled to that item. 28 VRP at 6115. In contrast, the jury could also start with an empty bowl and award Skanska each individual cost item, placing metaphorical M&Ms in the bowl one at a time.

The jury awarded Skanska its contract balance, its subcontractor claims, and all but four of its requested ARs. When moving to enter judgment, Skanska argued that prejudgment interest should run from January 31, 2020, the day it recorded its lien. The trial court agreed and imposed about $5.1 million in prejudgment interest.

B.     Award of Interest

Howell first argues that the trial court abused its discretion by awarding Skanska prejudgment interest at all. Because only liquidated damages are eligible for prejudgment interest, Howell contends that Skanska's damages were not liquidated because the instructions directed the jury "to use sound discretion in fixing an award of damages." CP at 18348. And Howell argues

that Skanska's bowl of M&M's analogy was an argument about how the jury should calculate damages for each AR. We disagree.

We review an award of prejudgment interest for abuse of discretion and will reverse only if the trial court's decision was manifestly unreasonable or based on untenable reasons. *Pub. Util. Dist. No. 2 of Pac. County. v. Comcast of Wash. IV, Inc.*, 184 Wn. App. 24, 75, 336 P.3d 65 (2014). "Untenable reasons include errors of law." *Noble v. Safe Harbor Family Pres. Tr.*, 167 Wn.2d 11, 17, 216 P.3d 1007 (2009).

Prejudgment interest is available "when an amount claimed is 'liquidated'" or "when the amount of an 'unliquidated' claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion." *Rekhter*, 180 Wn.2d at 124 (quoting *Prier v. Refrigeration Eng'g Co.,* 74 Wn.2d 25, 32, 442 P.2d 621 (1968)). A claim is liquidated "where the evidence furnishes data which, if believed, makes it possible to compute the amount with *exactness,* without reliance on opinion or discretion." *Prier*, 74 Wn.2d at 32 (emphasis added). "The rationale for this rule is that it would be unfair to hold a defendant accountable for interest on an amount that is unquantifiable and unforeseeable prior to a jury verdict" because "[a] defendant cannot stop the running of interest by paying the plaintiff if that defendant does not know the amount due." *Rekhter*, 180 Wn.2d at 124-25.

Here, the contract and other documents authorized Skanska to seek compensation for work through ARs. Skanska submitted extensive evidence of the amounts sought in each AR. As long as the jury found that Skanska was entitled to the types of costs it sought, and that it was entitled to compensation for a given AR, the jury could compute the amount Skanska was owed with

59

exactness. The fact that the jury had to believe Skanska's evidence in order to award it damages does not mean that the jury lacked a standard for awarding damages.

Likewise, the jury instruction language telling the jury to use its sound discretion in drawing inferences from the evidence does not mean that the damages awarded were unliquidated. And Skanska's bowl of M&M's analogy was a way to frame the overall outcome of the case—start with an empty bowl and award individual ARs, or start with a full bowl and remove individual ARs—not an argument about how to calculate damages for each AR. We hold that the trial court did not abuse its discretion by concluding that the damages awarded were liquidated and awarding prejudgment interest.

C.    Date Prejudgment Interest Began

Howell next contends that the trial court abused its discretion by running the prejudgment interest from January 31, 2020, the date that Skanska recorded its lien, because Skanska submitted some of its ARs to Howell after that date. It asks us to "hold that prejudgment interest may not be assessed on amounts claimed by a contractor after recording a lien when those amounts were not included in the recorded lien claim." Reply Br. of Appellant at 25. Skanska responds that caselaw establishes that prejudgment interest may begin accruing *before* a lien is recorded under the right circumstances, but otherwise universally begins to accrue the day a lien is recorded.

This argument does not affect the majority of Skanska's ARs, which were submitted before it recorded the lien in January 2020. It involves only about 13 ARs and some of the subcontractor claims, which it did not submit until later in 2020, and the increased general conditions and general requirements costs claims.

Skanska relies on *Shelcon Construction Group, LLC v. Haymond*, which states, "Interest begins to accrue when payment is due if the lien claims interest accruing and the complaint prays for interest predating the lien filing." 187 Wn. App. 878, 896, 351 P.3d 895 (2015). "By contrast, where the lien does not request interest and the complaint does not seek interest from the date payment was due, prejudgment interest begins to accrue only when the lien is filed." *Id*. But *Shelcon* only addresses payments that became due before the lien was filed, not payments that became due after the lien was filed. *Id.* at 897.

Howell's argument makes logical sense, especially if we construe the damages as liquidated. The theory behind prejudgment interest is that Howell could have avoided paying the interest if it just paid Skanska what it owed it when payment was due. As the *Rekhter* court explained, the rationale behind imposing prejudgment interest only for liquidated claims is that "[a] defendant cannot stop the running of interest by paying the plaintiff if that defendant does not know the amount due." 180 Wn.2d at 125. In other words, it would be unjust to assess interest starting in January 2020 for claims where Howell did not know how much it owed Skanska until after the lien was filed. Accordingly, we hold that the trial court abused its discretion by awarding prejudgment interest for *all* of Skanska's claims beginning on the day that Skanska filed the lien, instead of separately calculating the interest start date for ARs submitted after Skanska recorded the lien.

We remand for the trial court to recalculate prejudgment interest for the claims submitted after the lien was recorded. Prejudgment interest for those claims should begin to accrue on the day that Skanska submitted the claims to Howell.

## V. FORECLOSURE DECREE

Howell brought a CR 59 motion asking the trial court to amend the judgment to eliminate the order of foreclosure included in the judgment, which the trial court denied. Howell raises several challenges to the trial court's denial of its CR 59 motion to amend the portion of the judgment granting foreclosure. Skanska responds that Howell's CR 59 motion was improperly timed, but also answers each claim on the merits. We conclude the trial court did not err when it denied the motion to amend the judgment.

A.      Relevant Facts

Skanska recorded its lien in January 2020. Before filing its amended complaint, Skanska performed a title search which did not show any lien bond recorded on the property. On February 10, 2020, Skanska recorded an amended lien claim that allocated the lien proportionally among the 391 individual condominium units. The amended lien value was $25.4 million, but the payments Howell made on the withheld contract balance reduced the lien value to about $19.1 million by July 2020.

Paragraph 5.2 of Skanska's first amended complaint stated that it "properly recorded" an initial lien on January 31, 2020, and an amended lien on February 10, and included the respective recording numbers. CP at 24. Howell's answer stated, "Howell admits the allegations in paragraph 5.2 of the First Amended Complaint, with the understanding that the word 'properly' refers to the process of recording and not to the merits of Skanska's Claim of Lien." CP at 291.

Before trial, Skanska moved to exclude all evidence regarding "liens and lien bond costs." VRP (Jan. 24, 2022) at 72. Howell agreed that issues related to the lien could be litigated in posttrial motions.

After the verdict, Skanska moved to enter judgment on the verdict and foreclose the lien. Howell objected to the foreclosure, submitting a declaration stating that 346 units (about 83 percent) had been sold, and lien release bonds recorded. Howell argued that Skanska's lien now attached to those bonds rather than the units. Thus, it argued that the lien release bonds barred foreclosure of the building under RCW 60.04.161. The trial court foreclosed Skanska's lien when it entered the judgment against Howell, referring to the recording numbers for both the original and amended lien claim. The judgment does not mention the bond companies or the bonds, and although it includes a description of the property, the plain language effects foreclosure on the lien.

Howell then moved to amend the judgment under CR 59. Howell argued that Skanska never joined the surety for the lien release bonds as a party and "failed to plead or prove facts necessary to allocate its lien to the units and bonds." CP at 19139. Thus, Howell argued that Skanska was not entitled to foreclose on the original parcel, condominium units, or bonds, and sought to amend the judgment to remove the foreclosure decree.

Skanska responded that pursuant to a title search on January 30, 2020, "Howell had the only relevant property interest and there were no lien bonds recorded." CP at 22106. Skanska argued that the propriety of foreclosure "is a legal question that the Court properly considered in post-trial briefing." CP at 22113. It contended that because the foreclosure decree referred to the amended lien claim and its recording number, the decree was "complete and accurate," and the existence of lien bonds was not a basis to revoke the foreclosure. CP at 22114. Skanska emphasized that Howell obtained 346 lien bonds *after* litigation began, reasoning that it was impractical to require Skanska to amend the complaint 346 times to add each new bond. The trial court denied the CR 59 motion "for the reasons stated in Skanska's Response." CP at 22241.

At oral argument, both parties agreed that Howell had paid the judgment rather than allowing any foreclosure to proceed.

We review a trial court's ruling on a motion to amend judgment for abuse of discretion. *Worden v. Smith*, 178 Wn. App. 309, 322, 314 P.3d 1125 (2013). "A trial court abuses its discretion when its decision is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons," or if "it bases its ruling on an erroneous view of the law." *Id*. at 323.

B.      Legal Description of the Property

First, Howell argues that the trial court abused its discretion by granting foreclosure on units that had been sold to individuals who were not parties to the case. Skanska asserts that the legal description it used was sufficient to perfect the lien under *Rainier Pacific Supply, Inc. v. Gray*, 30 Wn. App. 340, 633 P.2d 1355 (1981).

When a party has recorded a lien against an entire building, and the building becomes a condominium, "the recording of the condominium declaration convert[s], by operation of law, the blanket lien[] into proportional liens" against each condominium unit. *Rainier Pac. Supply*, 30 Wn. App. at 343; *see* RCW 64.32.070(1). In *Rainier Pac. Supply*, Division One has addressed a case where a claim to foreclose a lien "contained only the legal description of the land on which the condominium was located," where the lien was recorded before the condominium declaration dividing the property into condominium units. 30 Wn. App. at 341. "Although a lien claim specifying the condominium character of the property would have been preferable, the legal description used by the materialmen in this case is sufficient to protect and perfect their right to a lien on the condominium units." *Id*. at 343-44. We follow Division One's reasoning on this issue.

Here, the decree of foreclosure referred to both the original lien claim with just the legal description of the land, and the amended lien that apportioned the lien amongst the condominium units. We hold that this legal description sufficed to perfect Skanska's lien.

C.      Whether the Bond Surety Was a Necessary Party

Howell next contends that Skanska could not foreclose on sold units where the lien converted to lien release bonds because the bond surety was not joined as a necessary party. Skanska argues that Howell did not obtain the lien bonds until after litigation commenced, so Skanska did not have to join the bond surety.

A "trial court lacks jurisdiction to adjudicate a dispute if all necessary parties are not before it." *Woodfield Neigh. Homeowner's Ass'n v. Graziano*, 154 Wn. App. 1, 3, 225 P.3d 246 (2009). "A party is necessary if that party's absence 'would prevent the trial court from affording complete relief to existing parties to the action or *if the party's absence would either impair that party's interest or subject any existing party to inconsistent or multiple liability.*'" *Id.* at 4 (quoting *Coastal Bldg. Corp. v. City of Seattle,* 65 Wn. App. 1, 5, 828 P.2d 7 (1992)).

In an action to foreclose a lien, the property owner is a necessary party. RCW 60.04.171. And the "interest in the real property of any person who, *prior to the commencement of the action*, has a recorded interest in the property, or any part thereof, shall not be foreclosed or affected unless they are joined as a party." RCW 60.04.171 (emphasis added). And "RCW 60.04.141 requires 'the owner of the subject property' to be named in actions where no release bond has been filed." *Inland Empire Dry Wall Supply Co. v. W. Sur. Co.*, 189 Wn.2d 840, 845, 408 P.3d 691 (2018) (quoting RCW 60.04.141). "A lien bond releases the property from the lien, but the lien is then secured by

the bond." *DBM Consulting Eng'rs, Inc. v. U.S. Fid. & Guar. Co.*, 142 Wn. App. 35, 42, 170 P.3d 592 (2007).

In a case where a release bond was recorded before litigation, the Supreme Court has held that a lien holder did not have to join the property owner if they sued the surety. *Inland Empire*, 189 Wn.2d at 855-56. And Division One has addressed a case where a consulting engineer, DBM, recorded a mechanic's lien and then sued a property owner before the property owner recorded a lien release bond. *DBM Consulting Eng'rs*, 142 Wn. App. at 37. DBM never joined the surety. *Id.* at 37-38. After receiving a favorable jury verdict, DBM failed to ask the trial court to enter judgment on its lien foreclosure claim; it entered judgment only on a breach of contract claim. *Id.* at 38. When the property owner failed to pay the judgment, DBM demanded that the bond surety pay the judgment. *Id.* Division One ruled that the surety was not obligated to pay on the lien bond "[b]ecause DBM did not obtain a judgment foreclosing its lien," but the court never mentioned any issue with the fact that the surety was not joined as a party in the original lawsuit. *Id.* at 42.

When describing *DBM Consulting Engineers* in *Inland Empire,* the Washington Supreme Court noted that "DBM could have, and likely should have, amended its pleadings and sought to foreclose *on the lien* secured by the bond." *Inland Empire,* 189 Wn.2d at 850 (emphasis added). This language was not essential to the holding, so it is dicta, but it discusses foreclosure on the lien, not foreclosure on the property or the addition of the surety as a party.

There is no binding caselaw addressing this exact scenario of a lien being converted to lien release bonds after litigation commences, but Skanska's argument makes logical sense in context and is consistent with the plain language of RCW 60.04.171 requiring joinder of "any person who, *prior to the commencement of the action*, has a recorded interest in the property." Under Howell's

logic, had it sold a unit and secured one additional lien release bond the day that the jury entered deliberations, Skanska's ability to foreclose on that unit—if not the entire building—would be in jeopardy.

Here, the trial court foreclosed on the lien attached to the real property. While the bond company had since secured the lien and would be a necessary party to foreclosure execution, it was not a necessary party when Skanska recorded its lien and filed the lawsuit because none of the lien release bonds existed at that time. Under the facts of this case, including Skanska's due diligence of performing a title search and naming the sole party with a valid interest in the complaint, we hold that Skanska was not required to join the bond surety as a necessary party in order for the trial court to foreclose on the lien.[9]

D.      Adjudication of the Foreclosure

Finally, Howell insists that the foreclosure claim was never properly tried or adjudicated, rendering the foreclosure decree improper. Howell's claim largely rests on its belief that the foreclosure should have been adjudicated against the lien release bonds. We disagree.

Howell cites caselaw stating that the party claiming a lien carries the burden of establishing their right to the lien. *See Westinghouse Elec. Supply Co. v. Hawthorne*, 21 Wn.2d 74, 77-78, 150 P.2d 55 (1944). But Howell cites no authority stating that a right to foreclosure must be tried to a jury, and it acknowledges that issues not tried to a jury can be tried by the court. CR 39(b). Howell also expressly agreed with the trial court that the merits of the lien issues could be handled in posttrial motions and does not argue that the trial court erred in making this ruling. Skanska argued

---

[9] Rather than referring only to the liens, the best practice would have been for the trial court to include a reference to any bonds that all parties and the court knew existed at the time that judgment was entered. But the failure to do so here does not make foreclosure of the lien invalid.

that foreclosure was appropriate in the motion to enter judgment and foreclose the lien. This included a declaration from counsel attaching the original and amended claim of lien, six partial satisfactions of lien, and the jury verdict.

It was not disputed that Skanska properly recorded its original lien, that Howell partially satisfied the judgment, or that the trial resulted in a jury verdict of nearly $20 million before interest and attorney fees. And, as discussed above, the sale of the condominium units and the conversion of proportional liens to lien release bonds is not fatal to Skanska's ability to foreclose on the proportional liens and bonds. We hold that the trial court did not err by granting foreclosure of Skanska's lien.

Overall, we hold that the trial court did not abuse its discretion by denying Howell's CR 59 motion to amend the judgment. Because we affirm on the merits, we need not reach Skanska's argument that Howell's CR 59 motion was improperly timed.

## ATTORNEY FEES

### I. ATTORNEY FEES BELOW

During trial, witnesses for Holmberg and Sequoyah, including hired experts, testified about the subcontractors' claims. Skanska also presented testimony from several experts to support its claims for ARs for changed work, increased general conditions and general requirements costs, and time extensions on the contract

After the judgment, Skanska moved for about $6.7 million in attorney fees and costs, including fees for its own experts, as well as the subcontractors' attorneys and experts, under RCW 60.04.181(3), which governs attorney fees in construction lien cases. The trial court granted the motion for the overwhelming majority of the amount requested, awarding Skanska $6.6 million in

fees and costs. This included about $426,000 for Holmberg's and Sequoyah's attorney fees, expert costs, and other expenses.

The trial court found that the subcontractors' fees and expenses were necessary expenses because Skanska "'passed through'" the subcontractors' claims, "and Skanska could not have presented the subcontractors' claims without cooperation from them and guidance from their own counsel in discovery and at trial." CP at 22258. The trial court also awarded Skanska about $1.3 million in fees for its expert witnesses "because Skanska's expert witnesses were necessary to prove their claims and defend against Howell[']s claims." CP at 22257.

A.    Skanska's Attorney Fees

Howell raises several challenges to the trial court's award of attorney fees. First, Howell argues that the trial court erred by ruling that Skanska was a prevailing party under RCW 60.04.181(3) when Skanska was not entitled to foreclose on most of its lien. Second, Howell contends that because Skanska "did not prevail as to the claims on which it based its Claim of Lien, the trial court should not have deemed it the prevailing party under RCW 60.04.181(3)." Br. of Appellant at 75. We disagree.

Howell's first argument rests on the assumption that we would reverse the lien foreclosure, which we have declined to do. For Howell's second argument, Skanska prevailed on lien foreclosure below and overwhelmingly prevails on appeal. And it received a roughly $19.2 million judgment before attorney fees, the overwhelming majority of which we affirm, while the amended lien claim was for $19.1 million. After interest and attorney fees, the judgment totaled $30.8 million. Thus, satisfying the judgment—even before interest and attorney fees—would equal or exceed the value of the lien. Accordingly, Skanska was a prevailing party under RCW

60.04.181(3). We hold that the trial court did not abuse its discretion by awarding Skanska attorney fees.

B.       Fees for Subcontractors' Attorneys and Expert Witnesses

Howell asserts that the trial court improperly awarded Skanska fees for its subcontractors' attorneys and both Skanska's and the subcontractors' expert witnesses. We disagree.

RCW 60.04.181(1)(d) and (e) allow both subcontractors and prime contractors to record liens against the same property. And a "court may allow the prevailing party" to recover "as part of the costs of the action, the moneys paid for recording the claim of lien, costs of title report, bond costs, and attorneys' fees *and necessary expenses incurred by the attorney* in the superior court, court of appeals, supreme court, or arbitration, *as the court or arbitrator deems reasonable*." RCW 60.04.181(3) (emphasis added). The statute is " to be liberally construed to provide security for all parties intended to be protected by [its] provisions." RCW 60.04.900. Here, Holmberg and Sequoyah had liens on the Nexus tower too.

Howell asks us to strictly construe the sentence in RCW 60.04.181(3) that discusses "attorneys' fees and necessary expenses incurred by the attorney" as excluding cooperating subcontractor attorneys and other parties' expert witnesses. The only authority Howell cites is an unpublished Ninth Circuit case where the Ninth Circuit relied on the "ordinary meaning" of "expense" to hold that, although an "attorney may have incurred a debt" by hiring an expert witness, "it was not a necessary expense of the attorney in the professional service to the client." *In re Uribe, Inc.*, No. 98-36021, 2000 WL 1028706, at *1 (9th Cir. 2000) (court order).

We review attorney fee awards for abuse of discretion and must liberally construe the statute controlling attorney fees in this case in favor of the party requesting fees. RCW 60.04.900.

Further, the trial court was correct that Skanska would not have been able to present Holmberg's and Sequoyah's claims without cooperation from their attorneys and testimony from their expert witnesses at trial. Absent resolution of their claims through this litigation, additional litigation would have been required to resolve each subcontractor's claim, which would have been unnecessarily inefficient for the parties and the courts. And Skanska's expert witnesses were similarly necessary to Skanska's attorneys' case, as they testified and produced reports to argue that Skanska was entitled to millions of dollars in ARs and more than 50 days of time extension on its contract. Under the facts of this case, it was not untenable to consider these costs "necessary expenses" under RCW 60.04.181(3) in the specific context of this case. Accordingly, we hold that the trial court did not abuse its discretion by awarding Skanska attorney fees for its subcontractors and expert witness costs.

## II. APPELLATE ATTORNEY FEES

Both parties seek appellate attorney fees under RAP 18.1 and RCW 60.04.181(3). Because Howell prevails only partially on one of multiple issues, Skanska has overwhelmingly prevailed on appeal. We grant Skanska's request for the full amount of its appellate attorney fees without segregation. We deny Howell's request for appellate attorney fees.

## CONCLUSION

We reverse the amount of prejudgment interest awarded to Skanska and remand solely for the trial court to recalculate the amount of prejudgment interest for the limited number of Skanska's ARs that were submitted after the lien was recorded. We otherwise affirm. We deny Howell's request for appellate attorney fees and grant Skanska's request for the full amount of its

No. 58950-8-II

appellate attorney fees. The amount of appellate attorney fees will be determined by a commissioner of this court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
GLASGOW, J.

We concur:

_____
LEE, P.J.

_____
CHE, J.